HOWARD D. JOHNSON COMPANY *v.* PARKSIDE DEVELOPMENT CORPORATION AND FRANCHISE REALTY CORPORATION.

[No. 1-775A115. Filed June 14, 1976.]

380

Thomas C. Bigley, Jr., Sharpnack, Bigley & David, of Columbus, for appellant.

Donald W. Buttrey, Randolph L. Seger, McHale, Cook & Welch, of Indianapolis, Paul D. Lawson, Lawson, Pushor, Mote & Schug, of Columbus, for appellee Parkside Development, Donald F. Foley, Yaeger, Foley, Hafsten & McLin, of Indianapolis, Crump & Angermeier, of Columbus, for appellee Franchise Realty.

ROBERTSON, C. J.—Howard D. Johnson Company (Johnson) filed a suit for a temporary restraining order, preliminary injunction and permanent injunction against Parkside Development Corporation (Parkside), Franchise Realty Corporation (Franchise) which is a subsidiary of McDonald's Corporation, and Construction Management Services, Inc. The trial court granted the temporary restraining order and preliminary injunction. Johnson now appeals the subsequent denial by the trial court of its request for a permanent injunction.

Franchise now appeals the trial court's overruling of its motion to increase bond.

The facts of the case are that on January 30, 1965, Johnson, as lessee, and Parkside, as lessor, executed a lease containing a covenant which prohibited the establishment of a restaurant within 1500 feet of the Johnson leasehold premises on Parkside's property. The covenant made an exception for a nearby motel already under construction. On the same date, Johnson and Parkside executed a Declaration of Lease (Memorandum of Lease) that was recorded on June 11, 1965. The recorded Memorandum of Lease did not set forth the covenant at issue nor describe any real estate other than Johnson's leasehold. The pertinent portion is set out below.

> "That said lease itself contains the entire contract between the parties, including the amount of rent, times when rent shall be paid, and other provisions and covenants as regulated and govern the relationship of landlord and tenant between the parties; and all persons are hereby put on notice of the existence of such lease and are referred to the said lease itself for its terms and conditions."

In February of 1974, an agent for Franchise began negotiating with Parkside to lease a parcel of land on which to build a McDonald's restaurant. The restaurant was ultimately constructed approximately 275 feet from Johnson's building. During the negotiations and various communications between Franchise and Parkside, there was no mention of the Johnson covenant. In fact, Parkside replied in the negative when asked by Franchise if there were any restrictions on the Franchise lease. Prior to executing a lease, Franchise engaged Pioneer Title to conduct a title search. Pioneer's agent made a normal title search and, in addition, examined a proposed plat of the entire Parkside development and the Memorandum of Lease recorded by Johnson. Except for the plat, Pioneer's agent did not search beyond recorded instruments. The Johnson covenant was not discovered.

Notice of Franchise's petition for a zoning variance was published in Columbus in July, 1974 and again in August,

1974, and a newspaper article announcing the construction of the restaurant was published on August 6, 1974. Construction began during the first week in September, 1974.

On October 4, 1974, Parkside, upon becoming aware of the Johnson covenant, phoned Johnson at Chicago to inform them of what had transpired. Testimony indicates that this call communicated the first actual knowledge to Johnson at Chicago of the Franchise lease. Johnson responded that it would not waive the covenant. On October 9, 1974, letters were sent to Parkside and Franchise stating that the restaurant construction should stop. Construction continued.

On November 12, 1974, Johnson filed a complaint for injunction requesting a temporary restraining order without notice and a preliminary injunction. After an *ex parte* hearing, the trial court issued a temporary restraining order without notice on November 13, 1974. Johnson posted a $50,000 surety bond. After a hearing, a preliminary injunction was issued on November 22, 1974, and the trial court made 13 findings of fact.

Thereafter, on November 27, 1974, Franchise, based upon evidence submitted at the preliminary injunction hearing that its damages could exceed $400,000, filed a motion to increase bond. This was overruled by the trial court.

Upon motion of Franchise and Parkside, agreed to by Johnson, the court ordered consolidation of the evidence from the preliminary injunction hearing and advanced and consolidated that hearing into the hearing on the permanent injunction. As a result of that hearing the trial court found against Johnson, denying the permanent injunction and dissolving the preliminary injunction. The court made two additional findings of fact, here summarized to be that Johnson's recorded Memorandum of Lease did not give notice of the restrictive covenant and that Johnson failed to prove by a preponderance of the evidence that Franchise had knowledge, either actual or implied, or notice, either actual or constructive of the restrictive covenant at the time the Franchise lease was exe-

cuted. The court concluded that Johnson's remedy, if any, against Parkside was at law.

The first matter to be decided is whether, as Johnson contends, the trial court's unappealed preliminary injunction became "the law of the case" when the parties submitted the case for permanent injunction by an agreement to consolidate the evidence. Johnson misapprehends the nature of "the law of the case." A judgment *on appeal* constitutes "the law of the case" as to particular issues decided and is applicable throughout subsequent stages of the case. *Bd. of Comm'rs of Huntington County* v. *Bonebrake* (1896), 146 Ind. 311, 45 N.E. 470; *Fair Share Organization, Inc.* v. *Mitnick* (1964), 245 Ind. 324, 198 N.E.2d 765. No appeal having been previously taken, no "law of the case" could have been established to bind the trial court at the hearing on the permanent injunction.

Johnson next alleges that, at the time Franchise executed its lease with Parkside, Franchise had actual or constructive notice of the existence of Johnson's non-competition covenant and, therefore, was bound by the provisions of the covenant.

At the outset before discussing Johnson's allegation, we would do well to describe the creature we seek to leash. It has been variously named restrictive covenant, grant of exclusive privilege, grant of exclusive mercantile rights, and non-competition covenant. A lessor may exact from a lessee a covenant not to engage in particular commercial activities in which the lessor or other of his lessees are already engaged, or a lessee may exact from the lessor a covenant not to engage in nor permit subsequent lessees of land retained by the lessor to engage in particular commercial activities in which the primary lessee contemplates pursuing. The effect of such a covenant is to create a limited geographic monopoly. As such, it is a restraint on trade and will be enforced by the courts only if the covenant is positively expressed. Even then, it will be narrowly construed. 49 Am.Jur.

2d *Landlord and Tenant* § 162 (1970); Pollack, *Shopping Center Leases,* 9 Kans. L.Rev. 379, 390 (1961).

There are conflicting views as to whether a non-competition covenant is personal or runs with the land. In *Taylor* v. *Owen* (1830), 2 Blackf. 301, the Supreme Court of Indiana held that such a covenant was of a personal nature, did not run with the land, and could not be made the subject of a subsequent conveyance. That decision represents a minority view in this respect; the majority of cases recognize such a covenant as being capable of running with the land. Reno, *The Enforcement of Equitable Servitudes in Land: Part II,* 28 Va. L.Rev. 1067 (1942). Professor Reno sets forth a persuasive rationale for the majority view. ". . . [I]f the business operated upon the promissee's land can be operated at a greater profit because the adjoining land is restricted against that type of business, then the market value of the land for business purposes has been enhanced. Isn't this the primary purpose of all building restrictions . . .?" Though *Taylor* v. *Owen, supra,* has never been expressly overruled, the implication of such decisions as *Jos. Guidone's Food Palace, Inc.* v. *Palace Pharmacy, Inc.* (1969), 252 Ind. 400, 248 N.E.2d 354, seems to be that non-competition covenants are enforceable by a lessee against a subsequent lessee of the common lessor where the subsequent lessee of adjoining property has prior knowledge of the covenant. Whether *Taylor* v. *Owen, supra,* has legally expired or not, we suspect that modern commercial practices treat it as a nonentity.

Assuming that non-competition covenants are enforceable, we turn to Johnson's allegation that at the time Franchise executed its lease with Parkside, Franchise had actual or implied knowledge or actual or constructive notice of the existence of Johnson's non-competition covenant and, therefore, was bound by the provisions of the covenant.

Though a lessee's interest in real property is less than that of an owner in fee, each wears a mantle of similar thread as to the obligations imposed and protection afforded when

they acquire or seek to acquire their respective interests in property. Accordingly, if Franchise had the requisite knowledge or notice of the covenant when it executed its lease, the covenant is enforceable against Franchise. In the alternative, if the requisite knowledge or notice was not present, Franchise takes its leasehold interest free of the restriction.

Johnson argues that Franchise, by the title search conducted for it, had actual notice of the existence of Johnson's recorded Memorandum of Lease, was thereby put on inquiry as to the provisions of the unrecorded lease, and was chargeable with constructive notice of those provisions.

The holding in *Hazlett* v. *Sinclair* (1881), 76 Ind. 488, has the effect of charging Franchise with knowledge of all information supplied by the recorded conveyances of Parkside. The Johnson Memorandum of Lease is such a conveyance, and Franchise did have actual knowledge of the information contained therein, including reference to the unrecorded lease. But was that knowledge sufficient to create a duty to pursue an inquiry concerning the provisions contained in the unrecorded lease? We think not.

The foremost purposes of the recording acts are to focus the scope of a search by one interested in particular real property and to impart notice to such party of information contained in the recorded documents. While one may indeed be charged with a duty to pursue an inquiry reasonably suggested by documents within the chain of title of the property being searched, here the document (the Memorandum of Lease) was not within Franchise's chain of title, and, absent a specific reference to the existence of a servitude on the adjoining property, was inadequate to impose a duty to pursue any further inquiry. There is nothing in the Memorandum of Lease calculated to inform anyone of restrictions on the adjoining property. Correspondingly, Franchise cannot be charged with constructive notice of information contained in Johnson's unrecorded lease.

In addition, Johnson contends that other factors created a

duty in Franchise to inquire concerning the existence of a non-competition covenant.

One of those factors is the alleged existence of a custom in the industry to use non-competition covenants. Assuming that such a custom exists, we are not prepared to say that it imposes a duty on Franchise to do more than it actually did in searching the title and making inquiry. Indeed, the record discloses that Franchise inquired of Parkside as to restrictions on the property and received a negative reply.

Another factor Johnson sets forth is that Franchise, before its lease was executed, had actually observed the existing Howard Johnson restaurant on adjacent land, was aware of the activity thereon, and was put on inquiry of the existence and contents of the unrecorded lease. Both cases Johnson cites for the proposition that a physical condition or activity on land will impose a duty to inquire are to be distinguished from the facts of the case at bar. In both *Smith* v. *Mesel* (1949), 119 Ind.App. 323, 84 N.E.2d 477, and *Smith* v. *Schweigerer* (1891), 129 Ind. 363, 28 N.E. 696, the physical condition or activity occurred on the land of the subsequent purchaser. There existed overt manifestations of prior interests on *the land about to be acquired by the subsequent purchasers.* Here, the record reveals absolutely no physical condition or activity on the land adjacent to Johnson's leasehold which would put Franchise on inquiry.

Finally, Johnson contends that Parkside developed the subdivision according to a common plan of commercial or business development, that Franchise was aware of the plan before it executed its lease, and that Franchise should be considered to be on notice of restrictions in other deeds and leases in the development area or at least to be on inquiry as to the contents of such deeds and leases.

The plat of the subdivision being developed by Parkside may well indicate the existence of a common plan of commercial or business development, but having said that, we

cannot appreciate how Johnson's argument is assisted thereby. *Sorrentino* v. *Cunningham* (1941), 111 Ind.App. 212, 39 N.E. 2d 473; *Bachman* v. *Colpaert Realty Corp.* (1935), 101 Ind. App. 306, 194 N.E. 783; and *Elliot* v. *Keely* (1951), 121 Ind. App. 529, 98 N.E.2d 374, all of which Johnson has cited, concern restrictive covenants which were integral to the common plan or scheme of the respective developments. The purpose of those covenants was to provide a common benefit for all of the grantees within the developments. Clearly, the benefit of Johnson's non-competition covenant was intended to inure to but one party among all the grantees and lessees in the development—Johnson. Thus, we are constrained to the view that this particular covenant is not a critical component of the common plan or scheme of the development and knowledge of such common plan or scheme does not, as a matter of law, impart notice of nor a duty of inquiry as to the covenant.

None of the factors mentioned by Johnson constitute notice, actual or constructive, of the non-competition covenant nor do any of the factors justify imposing upon Franchise a duty to inquire. Nor do we perceive a synergistic effect from any combination of the above factors.

Further, we find no error by the trial court in its failure to make the additional findings of fact that Johnson would have had it make. We do not understand the various findings of fact to be inconsistent among themselves nor the sum of the findings of fact to be antagonistic to the conclusions reached by the trial court.

Franchise in its appeal assigns as cross-error the trial court's failure to increase Johnson's bond following the preliminary injunction hearing when Franchise presented uncontradicted evidence that its damages would be greater than the bond fixed by the trial court and filed by Johnson.

Franchise urges upon this Court that, to the extent the bond is insufficient to recompense Franchise and the other Defendants, Franchise will suffer a taking of its property

without due course of law in violation of Ind. Const. art I, § 12, as follows:

> *"Courts open—Due course of Law—Administration of justice.*—All courts shall be open; and every man, for injury done to him in his person, property, or reputation, shall have remedy by due course of law. Justice shall be administered freely, and without purchase; completely, and without denial; speedily, and without delay."

It is contended that such a result is consequent to the application of the rule in *Harless et al.* v. *Consumers' Gas Trust Co.* (1896), 14 Ind.App. 545, 43 N.E. 456, which held that, absent a showing of malice or lack of probable cause on the part of the plaintiff, a person enjoined may recover his damages only in an action on the undertaking or bond.

Thus, Franchise asks that we reverse the trial court's finding that the $50,000.00 bond was sufficient and remand the issue of the sufficiency of the bond to the trial court for further hearing and for the posting of additional security.

We must decline Franchise's request for two reasons. First, the time for posting security is past. Additional "security" at this stage of the case would, in fact, be more akin to a forfeiture. Surely no bond could now be procured. Second, the fixing of the amount of security under the authority of Ind. Rules of Procedure, Trial Rule 65(C), is a discretionary function of the trial court and is reversible only for an abuse of that discretion. Given the speculative nature of some of the components of damages that Franchise offered into evidence, we cannot say the trial court abused its discretion at the time the bond amount was fixed or at the time the trial court refused to increase the amount of the bond, and a subsequent determination that actual damages incurred exceed the amount of the bond is not conclusive of an earlier abuse of discretion.

Under TR. 65(C), "[t]he security is intended to compensate the defendant for any damages incurred as a result of

the preliminary injunction if he prevails at a later hearing." *Palace Pharmacy, Inc.* v. *Gardner and Guidone, Inc.* (1975), 164 Ind.App. 513, 329 N.E.2d 642. A surety bond is a convenient manifestation of financial responsibility on the part of a plaintiff, and, by operation of TR. 65.1, provides an expeditious means of recovery of damages by a prevailing defendant. The trial court in establishing the amount of the security must, of necessity, do so on a conjectural basis, guided by divergent estimates of damages offered by the opponents before the court and by the trial judge's own experience and knowledge. The trial court's most diligent efforts in this respect may ultimately be wide of the mark though.

Because of the purpose of the security and the unavoidable inexactitude by which it is fixed, no one, save the surety, should be bound by the amount thereof. If the damages are eventually ascertained to be less than the amount of the security given by the plaintiff, the defendant's recovery will be limited to the damages incurred. Accordingly, if the damages incurred by the defendant exceed the amount of the security, it is only logical that the defendant should be made whole again by recovery of the excess from the plaintiff. Further, TR. 65(C), we believe, implies that any party wrongfully enjoined or restrained may recover for costs and damages incurred or suffered, regardless of the character of the plaintiff. A governmental organization is responsible for costs and damages *as may be incurred or suffered* by a party wrongfully enjoined or restrained. The presumption of financial integrity on the part of a governmental organization may obviate the necessity for the giving of security, but surely recovery of the full measure of a wrongfully enjoined or restrained defendant's damages was not intended to be contingent upon the plaintiff being a govermental organization. Such a defendant is susceptible to damages irrespective of the plaintiff bringing suit, and the recovery available should likewise be the same, irrespective of that plaintiff.

In summary, while we find no abuse of discretion on the part of the trial court in refusing Franchise's request that the security be increased, we conclude, *Harless, supra,* notwithstanding, that Franchise's recovery of costs and damages need not be limited by the amount of the bond and that Franchise need not suffer a taking of its property without due course of law.

Affirmed.

Lybrook, J., concurs; Hoffman, J., participating by designation, concurs.

NOTE.—Reported at 348 N.E.2d 656.