**In re CHURCHILL PROPERTIES III, LIMITED PARTNERSHIP, an Illinois Limited Partnership, Debtor.**

**Bankruptcy No. 95 B 51230.**

United States Bankruptcy Court, N.D. Illinois, Western Division.

June 6, 1996.

Bradley J. Waller, DeKalb, IL, for C & H Enterprises.

Mark K. Thomas, Chicago, IL, for First Nationwide Bank.

Christopher J. Horvay, Chicago, IL, Mary P. Gorman, Rockford, IL, for Churchill Properties III Limited Partnership.

## MEMORANDUM OPINION

RICHARD N. DeGUNTHER, Bankruptcy Judge.

This matter comes before the Court on the Motion of C & H Enterprises ("C & H") Objecting to Rejection of Executory Contracts or in the Alternative to Provide Lessee with Relief Pursuant to 11 U.S.C. § 365(h)(1)(A)(ii); C & H's Memorandum of Law; Memorandum of First Nationwide Bank ("Bank") in Support of Debtor's Motion for Entry of an Order Authorizing Rejection of Certain Executory Contracts and Leases and in Opposition to Request of C & H Enterprises for Relief Pursuant to 11 U.S.C. Section 365(h)(1)(A)(ii); and C & H's Memorandum of Law in Response to First Nationwide Bank's Memorandum in Support of Debtor's Motion for Entry of an Order Authorizing Rejection of Certain Executory Contracts and Leases and in Opposition to

Request of C & H Enterprises for Relief Pursuant to 11 U.S.C. Section 365(h)(1)(A)(ii) and in Further Support of C & H Enterprises Request for Relief Pursuant to 11 U.S.C. § 365(h)(1)(A)(ii).

## BACKGROUND

The background of this case merits some attention. The Debtor was primarily engaged in the business of owning and operating an apartment complex in DeKalb, Illinois, commonly known as Amber Manor Apartments ("Amber Manor"). The apartment complex contains 227 units.

The Debtor filed for relief under Chapter 11 of the Bankruptcy Code ("Code") on June 19, 1995. The Debtor filed its initial Plan of Reorganization and Disclosure Statement on October 10, 1995. On October 24, 1995, the Debtor filed its Amended Plan of Reorganization and Amended Disclosure Statement (this plan and all subsequent plans shall be referred to as "Plan").[1] In accordance with the liquidating plan, the Debtor sought to sell, and in fact did sell, Amber Manor.

The hearing date for the Plan confirmation was January 17, 1996. Prior to that date, the Debtor filed its "Motion for Authority to Sell Amber Manor" ("Sale Motion") and its "Motion for Entry of an Order Authorizing Rejection of Executory Contracts and Leases" ("Rejection Motion"). Both the Sale Motion and the Rejection Motion were set for January 17, 1996. The Rejection Motion, however, was not properly noticed.[2] The Rejection Motion, including the corresponding notice, was the first and only notice C & H had received regarding the Debtor's bankruptcy.

On January 17, 1996, the following events transpired. The Debtor, C & H and the Bank were all present in court. The Rejection Motion based on the improper notice

---

**1.** An Order approving the Amended Disclosure Statement was entered on January 17, 1996.

**2.** The Rejection Motion contained language of the pending sale. Paragraph 6 of the Rejection Motion states:

On December 22, 1995, the Debtor filed its Motion to Sell Amber Manor Free and Clear of All Liens, Claims, and Encumbrances to 3169 N. Lincoln Corporation (the "Purchaser"). The hearing to approve the sale is scheduled for January 17, 1996. The Debtor anticipates

was continued to January 24, 1996.[3] The Debtor, through its counsel, modified the Order confirming the Plan in open court to provide for a hearing on C & H's objection to the Debtor's Rejection Motion.[4] Furthermore, C & H stated that the Debtor "verbally represented to this court that plan confirmation was expressly contingent upon disposition of the [Rejection Motion]" as it related to C & H. The Court entered an Order confirming the Plan effective as of 12:45 p.m.

The Order confirming the Debtor's Plan includes the following language:

E. Any and all liens, claims, or encumbrances in and to the Debtor's assets are hereby discharged, released, and extinguished and shall be otherwise unenforceable against the Debtor and the Debtor's assets under applicable law, except as otherwise provided in the Plan.

Thereafter, the Court entertained the Debtor's Sale Motion.[5] The Bank submitted a credit bid for Amber Manor in the sum of $4,200,000.00. No higher bids were offered. The Sale Order, which was entered on January 19, 1996, provides in pertinent part:

18. The Sale shall effect a transfer of the Property free and clear of any and all liens, claims, interests and encumbrances, except as specifically set forth in this Order, with each such lien, claim, interest or encumbrance satisfied in accordance with the terms of either this Order or the Confirmed Plan.

19. The Debtor is hereby authorized and directed to sell, convey, transfer and as-

sign the Property to the Bank, free and clear of any and all liens, claims, interests and encumbrances, and the Bank shall acquire and be vested with all of the Debtor's rights in and to the Property free and clear of any and all liens, claims, interests and encumbrances; provided, however, that the Bank shall take the Property subject to the Senior Secured Claim and the Senior Secured Documents and the Bank shall assume the Debtor's liability and obligations with respect to the Senior Secured Claim and the Senior Secured Documents. Any and all other asserted liens, claims, interests and encumbrances shall attach to the proceeds of the Sale and shall be satisfied, if at all, pursuant to the terms of the Confirmed Plan.

The Bank, as noted in the Disclosure Statement, is the holder of a "secured wraparound promissory note in the principal amount of $4,600,000. The note is secured by a second mortgage on the property and an assignment of rents. The unpaid principal balance of the promissory note includes the amount of Bell Federal's lien. As of the Petition Date, the balance due under the note was $4,223,022.21. This amount also includes the amount due to Bell Federal under its loan documents." The Bank's note was secured by a Wraparound Mortgage and Security Agreement recorded on November 16, 1984.

On September 18, 1994, C & H entered into a lease agreement to operate the laundry concession at Amber Manor for a period

---

that Amber Manor will be sold at the hearing to the Purchaser or to another bidder.

3. In fact, the Rejection Motion did not appear on the Court's docket sheet for January 17, 1996.

4. Specifically, this related to C & H's Motion Objecting to Rejection of Executory Contracts or in the Alternative to Provide Lessee with Relief Pursuant to 11 U.S.C. § 365(h)(1)(A)(ii).

The Debtor's handwritten modifications to the "Order Confirming Debtor's Third Amended Plan of Reorganization" changed paragraph K to the following:

K. Pursuant to Section 7.03 of the Plan, all executory contracts and leases of the Debtor that have not been expressly assumed, assigned, rejected or terminated during the pen-

dency of the Debtor's Chapter 11 case, shall be deemed rejected upon the Effective Date of the Plan in accordance with Section 365 of the Bankruptcy Code except that the ~~Debtor's executory contracts set forth in the Debtor's~~ Debtor's Motion for Entry of an Order Authorizing Rejection of Executory Contracts and Leases dated December 12, 1995, shall be ~~deemed terminated on the closing of the sale of Amber Manor,~~ *except for C & H Enterprises, as to which the hearing on rejection is* continued until Jan. 24, 1996 at 11:30 a.m.

5. Though not formally noticed, C & H was present by counsel for the hearing on the Sale Motion.

of 19 years ("Laundry Agreement").[6] The Laundry Agreement was recorded by C & H on November 7, 1994. The Laundry Agreement provided C & H with the right to install coin operated washing, drying and laundry equipment in designated laundry areas. The terms of the Laundry Agreement required the Debtor to provide heat, gas, water, hot water, electricity and drain and to clean the laundry room and machines. C & H is required to pay to the Debtor–Owner 50% of the gross receipts collected from the equipment. The final provision of the Laundry Agreement states that "[t]his agreement is binding upon the parties hereto, their successors and assigns."

\*     \*     \*     \*     \*     \*

On May 21, 1996, the Court granted the Debtor's Rejection Motion and thereby the unexpired lease of C & H was rejected. Based on the rejection of the unexpired lease, C & H argues that Section 365(h)(1)(A)(ii) provides the sole and exclusive remedy. As such, C & H is not interested in filing a claim, but rather seeks to enforce its rights under Section 365(h)(1)(A)(ii).

The Bank, however, contends that Section 363(f)(1) provides for a sale free and clear of any interest if applicable state law allows for such a sale.[7] C & H's asserted right to remain in possession of its leasehold constitutes an interest within the bounds of Section 363, argues the Bank. Thereafter, the Bank points to Illinois judicial foreclosure procedure law which permits a sale of property free and clear of leasehold interests. *See* 735 ILCS 5/15–1501 et seq. (1996). The Sale Order transferred the property free and clear of any and all liens, claims, interests and encumbrances. Thus, the Bank argues that it purchased this property free and clear of any leasehold or possessory interest of C & H.

6.  Technically, the Laundry Agreement designates American National Bank and Trust Company of Chicago as the lessor, and C & H as the lessee.

7.  Section 363(f)(1) states:
    The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if—

## ISSUE

The issue is whether a Section 363(f) sale overrides the rights and remedies of a lessee under Section 365(h) when the lease in question was rejected after the Section 363(f) sale.

## DISCUSSION

A significant percentage of the litigation which bankruptcy courts are called upon to hear arises not from a natural substantive dispute that occurred during the legal relationship of the litigants, but simply because someone failed to perform a necessary act. But for that failure, the litigation would not have come into existence.

A recurring example is the failure of a debtor to list an important and obvious creditor in the voluntary petition. As a result, the creditor is not notified of the bankruptcy and is not aware of its right to participate from the outset. Such failure often is the catalyst for a costly case of first impression. This is such a case.

\*     \*     \*     \*     \*     \*

The Court is called upon to reconcile two apparently inconsistent Code provisions: Sections 363(f) and 365(h)(1)(A)(ii). Read and applied separately the respective provisions are innocuous. The difficulty arises when the two provisions must be applied together because each provision seems to provide an exclusive right that when invoked would override the interest of the other. For instance, if the Court decided that the sale of Amber Manor under Section 363(f) divested C & H of its leasehold, regardless of the existence of Section 365, C & H would lose the benefit of a 19 year lease and Section 365 would be rendered meaningless.[8] On the other hand, if the Court decided that C & H has the right to retain posses-

(1) applicable nonbankruptcy law permits such sale free and clear of such interests[.]
11 U.S.C. § 363(f)(1) (1996).

8.  As a technical matter, the Court agrees with C & H's assertions that C & H's estate in Amber Manor is a leasehold.

sion of its leasehold, the language in the Sale Order may be compromised. In that event the Bank might seek to have the sale set aside, thereby throwing the whole affair into chaos.

The Court has diligently searched for a relationship between these two Code provisions, yet none can be found based on the facts here.[9] Possibly this inherent inconsistency was something not contemplated by the drafters.[10] As will be shown, however, the recognition of Section 365 is more compelling and should rule the day.

\* \* \*

The amendment of Section 365(h)(1) in the Bankruptcy Reform Act of 1994 produced Sections 365(h)(1)(A)(ii) and 365(h)(1)(B) which state:

> (1)(A) If the trustee rejects an unexpired lease of real property under which the debtor is the lessor and—
>
> .  .  .  .  .
>
> (ii) if the term of such lease has commenced, the lessee may retain its rights under such lease (including rights such as those relating to the amount and timing of payment of rent and other amounts payable by the lessee and any right of use, possession, quiet enjoy-

ment, subletting, assignment, or hypothecation) that are in or appurtenant to the real property for the balance of the term of such lease and for any renewal or extension of such rights to the extent that such rights are enforceable under applicable nonbankruptcy law.

> (B) If the lessee retains its rights under subparagraph (A)(ii), the lessee may offset against the rent reserved under such lease for the balance of the term after the date of the rejection of such lease and for the term of any renewal or extension of such lease, the value of any damage caused by the nonperformance after the date of such rejection, of any obligation of the debtor under such lease, but the lessee shall not have any other right against the estate or the debtor on account of any damage occurring after such date caused by such nonperformance.

11 U.S.C. § 365(h)(1) (1996).[11]

Section 365(h) prescribes the rights and remedies available to a lessee following a debtor-lessor's rejection of an unexpired lease. Specifically, the lessee's rights in the event of a rejection are set forth in Section 365(h)(1)(A)(ii). If the lessee elects to retain its rights pursuant to that Section, the reme-

---

9. In fact, no published cases specifically discuss the interplay between Section 363(f) and 365(h). In *In re Schnabel*, the Seventh Circuit, in dicta, stated that a trustee can sell a building free and clear of a lease. *In re Schnabel*, 612 F.2d 315, 316 (7th Cir.1980). This has been criticized in cases such as *In re Stable Mews Associates*, 35 B.R. 603, 607 (Bankr.S.D.N.Y.1983), where the court noted that *Schnabel* did not consider the language of Section 365 which provided the tenant with the option of remaining in possession.

10. Furthermore, few cases involving the rejection of an unexpired lease where the lessee is not the debtor are litigated. *See* Lawrence P. King et al., Collier on Bankruptcy, ¶ 365.09 at 365–67 (15th ed. 1992).

11. The previous provisions, Sections 365(h)(1) and (2), stated in pertinent part:

> (h)(1) If the trustee rejects an unexpired lease of real property of the debtor under which the debtor is the lessor, ... the lessee ... under such lease ... may treat such lease ... as terminated by such rejection, where the disaffirmance by the trustee amounts to such a breach as would entitle the lessee ... to treat

such lease ... as terminated by virtue of its own terms, applicable nonbankruptcy law, or other agreements the lessee ... has made with other parties; or, in the alternative, the lessee ... may remain in possession of the leasehold ... under any lease ... the term of which has commenced for the balance of such term and for any renewal or extension of such term that is enforceable by such lessee or timeshare interest purchaser under applicable nonbankruptcy law.

> .  .  .  .  .
>
> (2) If such lessee ... remains in possession as provided in paragraph (1) of this subsection, such lessee ... may offset against the rent reserved under such lease ... for the balance of the term after the date of the rejection of such lease ... and any such renewal or extension thereof, any damages occurring after such date caused by the nonperformance of any obligation of the debtor under such lease ... after such date, but such lessee ... does not have any rights against the estate on account of any damages arising after such date from such rejection, other than such offset.

11 U.S.C. § 365(h)(1) and (2) (prior to amendment).

dies are restricted to those set forth in Section 365(h)(1)(B).

A crucial inquiry in cases decided prior to the Bankruptcy Reform Act of 1994 was directed to the interpretation of the definition of "possession." *See e.g., In re Harborview Development 1986 Ltd. Partnership,* 152 B.R. 897, 900–02 (D.S.C.1993); *In re Lee Road Partners, Ltd.,* 155 B.R. 55, 59 (Bankr. E.D.N.Y.1993), *aff'd,* 169 B.R. 507 (E.D.N.Y. 1994). The sparse legislative history reveals that the changes incorporated in Section 365(h)(1)(A)(ii) were not only used to clarify a lessee's rights upon the rejection of a lease,[12] but the section "expressly provides guidance in the interpretation of the term 'possession' in the context of the statute." 140 Cong. Rec.H. 10752–1 (daily ed. Oct. 4, 1994).

The legislative history to Section 365(h), the predecessor to Section 365(h)(1)(A)(ii), is illustrative of Congress' intent. Congress sought to protect both the rights of the lessor and the lessee so as to preserve expectations in real estate transactions. *Lee Road,* 155 B.R. at 60 (citations omitted). Thus, rejection of a lease does not divest the lessee of its interest in the lease. *Id.* The lessee's interest in a leasehold cannot be modified or changed because of a pending bankruptcy. *In re Wood Comm Fund I, Inc.,* 116 B.R. 817, 818 (Bankr. N.D.Okla.1990).

\* \* \*

An accepted principle of statutory construction is that the specific prevails over the general. *See Matter of Nobelman,* 968 F.2d 483, 488 (5th Cir.1992), *aff'd,* 508 U.S. 324, 113 S.Ct. 2106, 124 L.Ed.2d 228 (1993) ("General language of a statute does not prevail over matters specifically dealt with in another part of the same enactment"); *In re Pacific Far East Line, Inc.,* 644 F.2d 1290, 1293 (9th Cir.1981). "When there is potential for conflict, specific provisions should prevail over the more general." *In re Nadler,* 122 B.R. 162, 166 (Bankr.D.Mass.1990) (citing *Jett v. Dallas Independent School*

*Dist.,* 491 U.S. 701, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989)).

Section 365(h) is clear and specific in providing for certain rights and remedies available to the lessee after rejection of its lease. Since Congress decided that lessees have the option to remain in possession, it would make little sense to permit a general provision, such as Section 363(f), to override its purpose. The Code is not intended to be read in a vacuum. Here, if the Court were to adopt the Bank's application of Section 363(f), the application of Section 365(h)(1)(A)(ii) as it relates to non-debtor lessees would be nugatory.

C & H seeks to remain in possession of the leasehold as provided by Section 365(h)(1)(A)(ii) and to enforce the lease provisions as against the Debtor's successor, presently the Bank. Allowing C & H to invoke this right is consistent with the plain language of Section 365(h) and the underlying intent of Congress.

C & H's Motion Objecting to Rejection of Executory Contracts or in the Alternative to Provide Lessee with Relief Pursuant to 11 U.S.C. § 365(h)(1)(A)(ii) should be granted to the extent that C & H should be permitted to retain its rights as provided under Section 365(h)(1)(A)(ii).

\* \* \*

The Court reserves for a further hearing the issue of remedies as provided under Section 365(h)(1)(B). The Court's decision to permit C & H to remain in possession in accordance with Section 365(h)(1)(A)(ii) compels a more thorough examination of the remedies alluded to by C & H. The parties should have an opportunity to flesh out their respective arguments.

---

12. Specifically, the legislative history states that "[t]his section will enable the lessee to retain its rights that are appurtenant to its leasehold. These rights include the amount and timing of payment of rent or other amounts payable by the lessee, the right to use, possess, quiet enjoyment, sublet, or assign." 140 Cong.Rec. H.10752–1 (daily ed. Oct. 4, 1994).