In re BEDFORD SQUARE
ASSOCIATES, L.P.,
Debtor.

Bankruptcy No. 99–35512DAS.

United States Bankruptcy Court,
E.D. Pennsylvania.

April 5, 2000.

Leslie Beth Baskin, Spector, Garden & Rosen, P.C., Philadelphia, PA, for debtor.

Max W. Hittle, Jr., Krieg Devault Alexander & Capehart, L.L.P., Indianapolis, IN, for debtor.

Robert M. Greenbaum, Saul, Ewing, Remick & Saul, LLP, Philadelphia, PA, for Kroger Limited Partnership I.

Michael Migliaccio, Philadelphia, PA, for New York Life Insurance and Annuity Corp.

Frederic Baker, Ass't. U.S. Trustee, Philadelphia, PA, for United States Trustee's Representative.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION

Although resolution of the contested matter before us involves reconciliation of 11 U.S.C. §§ 363(f) and 365(h), which is no easy task, we believe that this decision comes down to weighing the interests of a debtor-lessor in maximizing its use of its property against those of a tenant in enforcing lease provisions designed to protect its interests. In this instance we find the interests of the debtor-lessor in retaining an attractive tenant which is the anchor of its shopping center greatly outweigh those of the tenant in enforcing an unrecorded lease provision stating that no alteration to the center's parking lot can be made without its consent. Thus, in these circumstances, we hold that § 365(h)(1) does not enhance the tenant's rights such that they overcome the right of the debtor lessor to sell a portion of its property in a transaction which slightly, and not to the tenant's detriment, alters the parking lot. We further hold that, being unrecorded, these lease provisions are subject to avoidance and hence are "in bona fide dispute" pursuant to § 363(f)(4).

### B. FACTUAL AND PROCEDURAL HISTORY

BEDFORD SQUARE ASSOCIATES, L.P. ("the Debtor") owns and operates the Wal–Mart Plaza Shopping Center ("the Center") in Bedford, Indiana. The anchor tenant of the Center is, as one might guess, a Wal–Mart general merchandise store, which has been very successful since its opening in 1987. However, the national strategy of Wal–Mart, and its particular plan for the Bedford store, is to expand its successful general merchandise stores into "super centers," which also include supermarkets.

In order to accomplish this end as to the Center, Wal–Mart entered into a Purchase Agreement of June 28, 1999 ("the Agreement"), to acquire additional land and the assignment of a ground lease from the Debtor for a price of $2,811,500. With an adjoining property for which it has separately contracted an option to acquire, Wal–Mart intends to expand its store at the Center into a "super center." In so doing, it would reconfigure its store to a deeper site on the property and expand the parking lot ("the Lot") in front of the store.

The secondary tenant of the Center is Kroger Limited Partnership I ("Kroger"), as assignee of a Shopping Center Lease Agreement dated May 23, 1986 ("the Lease"), between the Debtor's predecessor and the John C. Groub Co. ("Groub"), pursuant to which a supermarket ("the Market") is operated in the Center. The Lease provides, *inter alia*, at § 1.2(b), as follows:

In regard to the parking area, Landlord agrees (i) to construct and continue to provide during the term of this Lease and any extensions thereof an *initial* parking lot ratio of at least 5.5 parking spaces per 1,000 square feet of gross leaseable building area in the center and (ii) and, except as shown on the site plan attached as *Exhibit A, no improvements*

*or alterations will be made to the parking areas without the prior written consent of the Tenant* ... (emphasis added to last three lines).

Although the evidence at the hearing established that the parking area in front of the Market would not thereby be changed and that the Wal–Mart expansion plan would in fact provide additional spaces proximate to the Market for the use of its customers, Kroger refused to give its consent to these "alterations" and "improvements" to the Lot. Its reasons are clearly not because of dissatisfaction with the changes to the Lot *per se*, but to attempt to avoid the competition it envisions will be created by the presence of the supermarket in the "super center."

The Debtor presented testimony that the Agreement is supported by its primary mortgagee, New York Life Insurance and Annuity Corporation ("NYL"). Indeed, NYL has filed a brief in support of the Debtor's position.

Wal–Mart's witness testified that its definitive goal is to build a "super center" somewhere in Bedford, if not in the Center, then in the vicinity of the Center. Thus, he indicated that, if the Agreement or other suitable arrangements to expand its present location in the Center are not consummated shortly, Wal–Mart will build elsewhere and close its store in the Center, even though its present lease runs for approximately six additional years. The Debtor and NYL rationally fear that this scenario will result in the anchor of the Center "going dark" and the ultimate demise of the Center as a profitable enterprise.

The instant dispute appears to be pivotal to the course of the instant case, which has otherwise been uneventful. A series of cash collateral orders between the Debtor and NYL have been entered, permitting the Debtor to collect and use the Center's rents, most recently through April 26, 2000. At a status hearing of February 23, 2000, the Debtor agreed to an order requiring it to file a plan and accompanying proposed disclosure statement by April 14, 2000.

The procedure by which the Debtor brought the instant issue before this court was somewhat fractured. On January 28, 2000, it filed an adversary proceeding, Adversary No. 00–120 ("the Proceeding"), naming Groub as the sole defendant in light of its unawareness of the assignment to Kroger, seeking authority to enter into the Agreement. The Proceeding was scheduled for trial on an expedited basis on March 1, 2000.

On February 7, 2000, the Debtor further filed, in the main bankruptcy case, a motion ("the Motion") to reject the Lease with Groub, receiving permission to schedule a hearing on the Motion with the trial on March 1, 2000. Thereafter becoming aware of Kroger's presence and its intention to oppose the relief sought, the Debtor entered into a stipulation with Kroger, presented to us in the form of an agreed order, withdrawing the Proceeding and allowing the issues regarding the proposed sale to Wal–Mart and the Motion to be heard together on March 1, 2000.

After the hearing on March 1, 2000, the interested parties agreed to simultaneously submit opening briefs by March 16, 2000, and reply briefs by March 23, 2000. The Debtor and Kroger both timely submitted opening and reply briefs and NYL submitted an opening brief supporting the Debtor's position.

## C. DISCUSSION

The relevant Code sections, 11 U.S.C. § 363(f) and 11 U.S.C. § 365(h)(1), provide in pertinent part as follows:

**§ 363. Use, sale, or lease of property**

. . . . .

(f) The trustee may sell ... free and clear of any interest in such property of an entity other than the estate, only if—

(1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(2) such entity consents;

(3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4) such interest is in bona fide dispute; or

(5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

. . . . .

## § 365. Executory contracts and unexpired leases

. . . . .

(h)(1)(A) If the trustee rejects an unexpired lease of real property under which the debtor is the lessor and—

. . . . .

(ii) if the term of such lease has commenced, the lessee may retain its rights under such lease (including rights such as those relating to the amount and timing of payment of rent and other amounts payable by the lessee and any right of use, possession, quiet enjoyment, subletting, assignment, or hypothecation) that are in or appurtenant to the real property for the balance of the term of such lease and for any renewal or extension of such rights to the extent that such rights are enforceable under applicable nonbankruptcy law.

(B) If the lessee retains its rights under subparagraph (A)(ii), the lessee may offset against the rent reserved under such lease for the balance of the term after the date of the rejection of such lease and for the term of any renewal or extension of such lease, the value of any damage caused by the nonperformance after the date of such rejection, of any obligation of the debtor under such lease, but the lessee shall not have any other right against the estate or the debtor on account of any damage occurring after such date caused by such nonperformance.

(C) The rejection of a lease of real property in a shopping center with respect to which the lessee elects to retain its rights under subparagraph (A)(ii) does not affect the enforceability under applicable nonbankruptcy law of any provision in the lease pertaining to radius, location, use, exclusivity, or tenant mix or balance.

(D) In this paragraph, "lessee" includes any successor, assign, or mortgagee permitted under the terms of such lease....

The Debtor argued that it was entitled to relief under 11 U.S.C. §§ 363(f)(4) or (f)(5). Its strongest argument, under § 363(f)(4), was that the admitted failure of Groub or its assigns to record the Lease rendered the Lease provisions relative to the Lot improvements contained therein avoidable under 11 U.S.C. § 544(a)(3) and applicable Indiana law, and hence rendered Kroger's interest in refusing to allow the proposed renovations to the Lot at best subject to "a bona fide dispute."

Kroger's strongest counter-arguments to this reasoning were that (1) under applicable Indiana law, the Debtor's knowledge of the restrictive covenant made its recording unnecessary to render it enforceable; and (2) §§ 365(h)(1)(A)(ii) and (h)(1)(C) not only protected the restrictive covenant from elimination as a result of the lease rejection, but also vested it with unavoidable rights which prevailed over the considerations expressed in § 363(f)(4).

The parties agree that *Howard D. Johnson Co. v. Parkside Development Corp.,* 169 Ind.App. 379, 348 N.E.2d 656 (1976), is a factually-analogous precedent under pertinent Indiana law. In that case, the defendant landlord leased a parcel of its real estate to the plaintiff for use as a restaurant. 169 Ind.App. at 381, 348 N.E.2d at 658. The lease contained a covenant prohibiting the landlord from establishing another restaurant within 1500 feet from the plaintiff's leasehold. *Id.* A Memorandum of Lease, rather than the lease itself, was

recorded by the parties, but it failed to reference the 1500–foot restriction. *Id.*

The landlord subsequently leased another parcel of its real estate to a third-party lessee which planned to construct a McDonald's restaurant on it 275 feet from the plaintiff's restaurant. 169 Ind.App. at 381, 348 N.E.2d at 659. The new tenant inquired of the landlord regarding restrictive covenants, which were apparently common in such leases, but the landlord replied in the negative, and the building of the McDonald's restaurant proceeded. *Id.*

The landlord eventually discovered the restrictive covenant, the plaintiff refused a request to waive it, and the plaintiff filed an action to enjoin the new lessee from completing construction of the McDonald's restaurant. 169 Ind.App. at 382, 348 N.E.2d at 659. Although the court held that the restrictive covenant was a possibly-enforceable provision, it held that the recording of only the Memorandum of Lease was insufficient to give new tenant constructive notice of the restrictive covenant which was, therefore, unenforceable against it. 169 Ind.App. at 383–85, 348 N.E.2d at 660–61. The court also rejected the plaintiff's argument that, because of the presence of the plaintiff's clearly visible activity of maintaining its restaurant on its leasehold, the new lessee "was put on inquiry of the existence and contents of the unrecorded lease," again because such provisions were alleged to be common. 169 Ind.App. at 386, 348 N.E.2d at 661.

Kroger contended that the findings that the *Johnson* plaintiff had no actual notice of the restrictive covenant suggest that, where actual knowledge of the covenant exists, as in the instant factual setting, the result would have been different. We cannot agree for several reasons.

 Firstly, the *Johnson* court begins from the premise that a restrictive covenant

is a restraint on trade and will be enforced by the courts only if the covenant

is positively expressed. Even then, it will be narrowly construed.

169 Ind.App. at 383, 348 N.E.2d at 660. This indicates a general principle of Indiana law not to favor enforcement of such provisions.

Secondly, the restrictive covenant at issue in *Johnson* was in fact a valuable restriction on a competitive use by a co-tenant. The instant Lease provision is not a restriction on use, but a provision relating to the Lot which Kroger is attempting to stretch into a restriction on use.

 Thirdly, and perhaps most importantly, *Johnson* did not present a bankruptcy scenario, where 11 U.S.C. § 544(a)(3), which provides in pertinent part as follows, comes into play:

**§ 544. Trustee as lien creditor and as successor to certain creditors and purchasers**

(a) The Trustee [or debtor in possession in his stead, pursuant to 11 U.S.C. § 1107(a),] shall have, as of the commencement of the case, and without regard to any knowledge of the trustee or of any creditor, the rights and powers of, or may avoid any transfer of property of the debtor or any obligation incurred by the debtor that is voidable by—

. . .

a bona fide purchaser of real property, other than fixtures, from the debtor, against whom applicable law permits such transfer to be perfected, that obtains the status of a bona fide purchaser and has perfected such transfer at the time of the commencement of the case, whether or not such a purchaser exists. . . .

This Code section allows the Debtor to stand in the shoes of a bona fide purchaser of the Center and avoid the improperly-recorded provision relating to the Lot in the Lease even if the Debtor itself had actual knowledge of this Lease provision. *See, e.g., In re U.S. Physicians, Inc.,* 236

B.R. 593, 600 (Bankr.E.D.Pa.1999); *In re Hunt's Pier Associates*, 143 B.R. 36, 49 (Bankr.E.D.Pa.1992); and *In re Rice*, 133 B.R. 722, 728 (Bankr.E.D.Pa.1991).

■ Although the Debtor has not commenced a § 544(a)(3) action to avoid the Lease provision at issue, the fact that it could in all probability do so successfully is sufficient to establish that a "bona fide dispute" regarding the enforceability of this Lease provision for purposes of § 363(f)(4) exists. *See In re Collins*, 180 B.R. 447, 452 & n. 7 (Bankr.E.D.Va.1995); *In re Octagon Roofing*, 123 B.R. 583, 590–92 (Bankr.N.D.Ill.1991); *In re Oneida Lake Development, Inc.*, 114 B.R. 352, 357–58 (Bankr.N.D.N.Y.1990); and *In re Millerburg*, 61 B.R. 125, 127, 128 (Bankr.E.D.N.C.1986).

Therefore, it is clear that the Debtor can proceed to effectuate the sale to Wal–Mart pursuant to the Agreement unless §§ 365(h)(1)(A)(ii), (h)(1)(C) dictate a different result. Thus, in its reply brief, Kroger advanced from arguing that § 365(h)(1) precluded a lease rejection (against which it could not defend) from eliminating its interests in the revisions to the Lot to arguing that § 365(h)(1) trumped § 363(f)(4) and prevented the sale to Wal–Mart from proceeding forward, citing *In re Taylor*, 198 B.R. 142, 161–67 (Bankr.D.S.C.1996); and *In re Churchill Properties III, L.P.*, 197 B.R. 283, 286–88 (Bankr.N.D.Ill.1996).

■ However, we believe that the facts of both of these cases are clearly distinguishable from those at issue here. In both of those cases, the rejecting landlord-debtors attempted to utilize § 363(f)(4) to eliminate entirely the respective leaseholds of the tenants asserting § 365(h)(1). *See Taylor*, 198 B.R. at 165–67; and *Churchill*, 197 B.R. at 286–88. In the context of the instant contested matter, neither the Debtor nor Wal–Mart are seeking to disturb Kroger's tenancy interests in any way. Insofar as the narrow issue of the effect of the Agreement on Kroger's access to parking can be isolated, the sale will result in the Lot's facilities being enhanced as to Kroger. Although the covenants in issue are not use restrictions, even if they were, there was no evidence that the proximity of another supermarket would hurt Kroger's business. Grocery customers are likely to take advantage of "specials" at both proximate stores in single shopping trips. *Compare Johnson, supra* (customers of one restaurant are unlikely to patronize another restaurant in the same trip).

■ It is true that restrictive covenants enforceable under applicable non-bankruptcy law survive a § 365(h) rejection. *See* §§ 365(h)(1)(A)(ii), (h)(1)(C); and *In re Chestnut Ridge Plaza Associates, L.P.*, 156 B.R. 477, 483–85 (Bankr.W.D.Pa.1993). However, *Chestnut Ridge* involved a use restriction the validity of which was otherwise not contested. *Id.* at 480.

The instant restrictive covenant, but way of contrast, is avoidable. *See* pages 144–145 *supra*. It is also not clear that Kroger's power to contest alternations and improvements to the Lot provided it with an absolute veto power over any changes whatsoever to the Lot, unconditioned on showing some detriment to Kroger or detriment which was at least as great as that resulting to the Debtor if the alternations, and improvements to the Lot were not permitted. It is likewise not clear that the provision which Kroger seeks to utilize would adversely impact "radius, location, use, exclusivity, or tenant mix or balance" in the Center, per § 365(h)(1)(C).

■ Furthermore, as we stated in *In re Carlton Restaurant, Inc.*, 151 B.R. 353, 356 (Bankr.E.D.Pa.1993), we believe that

the rights of a lessee whose lease has been rejected by a lessor-debtor are narrowly circumscribed by the precise language of § 365(h). That Code section, . . . allows only a lessee the choice to remain in possession under the terms of the lease. It does not provide that the lease continues, but merely accords

a lessee the choice to remain in a rented premises under the terms of the lease.

The narrow range of rights allowed to the rejected lessee should not include a power to block reasonable actions necessary to preserve itself which debtor's landlord undertakes which have not been proven to have any real detrimental effect on the tenant.

Therefore, we do not believe § 365(h)(1) can prevent the proposed sale of a portion of the Debtor's property to Kroger pursuant to the Agreement. We will therefore grant not only the Motion to reject the Lease, but also the Debtor's request that we allow it to perform its duties under the Agreement.

## D. CONCLUSION

An order consistent with the conclusions reached herein will be entered.