[No. E015549. Fourth Dist., Div. Two. Feb. 24, 1997.]

JOHN J. MISCIONE, Plaintiff and Appellant, v.
BARTON DEVELOPMENT COMPANY et al., Defendants and
Respondents.

1322

**COUNSEL**

Karns & Karabian, Jeff C. Marderosian and Gary N. Eisenhart for Plaintiff and Appellant.

Parilla, Militzok & Shedden, Bradley N. Garber and William A. Kozub for Defendants and Respondents.

## OPINION

**WARD, J.**—Plaintiff John J. Miscione (Miscione), as a successor landlord, filed an action for breach of an office lease and fraud. Defendant Barton Development Company (Barton Development) was the tenant under the lease and defendant James E. Barton (Barton) was alleged to be liable as an alter ego of the tenant. Defendants filed a motion for summary judgment contending the lease was subordinate to a prior trust deed on the property, and the foreclosure of the trust deed had extinguished the lease. The trial court granted summary judgment. Plaintiff appeals and contends that: (1) the general rule that foreclosure of a trust deed extinguishes a subordinate lease does not apply in this case; and (2) the defendants attorned to the new landlord by contractually agreeing to be bound by the lease. We agree and reverse.

### FACTUAL AND PROCEDURAL BACKGROUND

Defendant Barton, as general partner, formed Rancho Cucamonga Business Park Equities I (Equities I) to develop real property. Equities I constructed an office building known as Barton Plaza and thereafter borrowed $7.6 million from Coast Federal Savings (Coast). Equities I gave, as security for the loan, a trust deed to Coast. The trust deed was recorded January 31, 1986.

The deed of trust provided that Equities I could "not execute or enter into any lease . . . of the Mortgaged Property or any portion thereof without the advance written consent of [Coast] as to the form and substance thereof and the acceptability of the tenant . . . ."

On September 19, 1988, Equities I, as landlord, and Barton Development, as tenant, entered into a five-year lease of space in the office building. The lease was signed by Barton for Equities I and by a vice-president of Barton Development for the corporation. Barton was the president of Barton Development.

Paragraph 23 of the lease contained an attornment clause that provided: "In the event of any foreclosure sale, transfer in lieu of foreclosure or termination of the lease in which Landlord is lessee, Tenant shall attorn to the purchaser, transferee or lessor as the case may be, and recognize that party as Landlord under this Lease, provided that party acquires and accepts the Premises subject to this Lease."

The same paragraph also contained a subordination and nondisturbance clause that provided: "Upon written request of Landlord, or any first mortgagee, first deed of trust beneficiary of Landlord, or ground lessor of

Landlord, Tenant shall, in writing, subordinate its rights hereunder to the lien of any first mortgage, first deed of trust, or the interest of any lease in which Landlord is lessee, and to all advances made or hereafter to be made thereunder. However, before signing any subordination agreement, Tenant shall have the right to obtain from any lender or lessor of Landlord requesting that subordination, an agreement in writing providing that, as long as Tenant is not in default hereunder, this Lease shall remain in effect for the full Term. The holder of any security interest may, upon written notice to Tenant, elect to have this Lease prior to its security interest regardless of the time of the granting or recording of that security interest."

On August 21, 1991, Westinghouse Credit Corporation (Westinghouse) became the owner of the property through foreclosure of its second trust deed on the property. The Westinghouse second trust deed had been recorded on September 30, 1988. On January 30, 1992, Coast became the owner of the property through foreclosure on its first trust deed. Through letters dated January 30, 1992, and March 3, 1992, Coast notified the tenants of the building, including defendants, that it was the new landlord. Coast also requested in writing that defendants execute an estoppel certificate confirming the terms of the lease. Barton admitted receiving the estoppel certificate from Coast, but never executed or returned it. On June 16, 1992, Coast sold the building to Miscione. On July 31, 1992, defendants vacated the premises and have not paid the rent on the premises. This litigation followed.

Miscione sued Barton and Barton Development on the lease and for fraud. Prior to the trial defendants moved for summary judgment contending that the lease had been extinguished when Coast foreclosed on the property. Relying on *Dover Mobile Estates* v. *Fiber Form Products, Inc.* (1990) 220 Cal.App.3d 1494, 1498-1500 [270 Cal.Rptr. 183], defendants contended that Coast had an obligation under the lease to elect to have the lease senior to the deed of trust and that it had failed to do so. Defendants further contended that the fraud cause of action failed with the contract action since it was based upon the contract. The court below agreed with defendants' position and granted the motion for summary judgment. Judgment was entered. This appeal followed.

## DISCUSSION

### I. Standard of Review

On appeal from the trial court's grant of defendants' motion for summary judgment, ". . . we review the trial court's decision de novo,

applying the rule that '[a] defendant is entitled to summary judgment if the record establishes as a matter of law that none of the plaintiff's asserted causes of action can prevail. [Citation.] To succeed, the defendant must . . . demonstrate that under no hypothesis is there a material issue of fact that requires the process of a trial.' [Citation.]" (*Flatt* v. *Superior Court* (1994) 9 Cal.4th 275, 279 [36 Cal.Rptr.2d 537, 885 P.2d 950].)

The first step of the review begins with an analysis of the pleadings, because "[t]he pleadings define the issues to be considered on a motion for summary judgment." (*Ferrari* v. *Grand Canyon Dories* (1995) 32 Cal.App.4th 248, 252 [38 Cal.Rptr.2d 65].) We next evaluate the moving defendant's effort to meet its burden of showing that plaintiff's cause of action has no merit or that there is a complete defense to it. Once the defendant has met that burden, the burden shifts to the plaintiff to show that a triable issue of material fact exists as to its complaint. If the filings in opposition raise triable issues of material fact the motion must be denied; if they do not, the motion must be granted (Code Civ. Proc., § 437c, subd. (c); *River Bank America* v. *Diller* (1995) 38 Cal.App.4th 1400, 1410-1411 [45 Cal.Rptr.2d 790].)

The pertinent pleading here is the second amended complaint which contains causes of action for: (1) breach of written lease, (2) fraud—intentional misrepresentation, and (3) fraud—suppression of fact. Defendants answered with a general denial, and using the popular pleading technique of today, alleged 21 affirmative defenses including, inter alia, the defense that the lease was terminated as a matter of law by Coast's foreclosure.

Defendants relied upon this affirmative defense in their motion for summary judgment. The lower court accepted their argument that *Dover* applied and that the foreclosure terminated the lease. Plaintiff opposed the motion on the ground that the attornment provision of the lease preserved the landlord-tenant relationship even after foreclosures of the prior trust deed. Resolution of this issue depends upon the meaning of a contractual provision.

Thus, in addition to the standard of review for summary judgment, we must apply the standard of review for the interpretation of a written contract. "The interpretation of a written instrument presents a question of law for this court to determine anew." (*Klingele* v. *Engelman* (1987) 192 Cal.App.3d 1482, 1485 [238 Cal.Rptr. 199].) This court must interpret the lease entered into by the original landlord and tenant in order to determine the rights and liabilities of the parties.

Under Civil Code section 1636, "A contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of

contracting, so far as the same is ascertainable and lawful." Generally speaking, "the rules of interpretation of written contracts are for the purpose of ascertaining the meaning of the *words used* therein: evidence cannot be admitted to show intention independent of the instrument. [Citations.]" (1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, § 684, p. 617.)

## II. *Obligations Under a Lease Are Not Extinguished by Foreclosure Proceedings on a Prior Encumbrance When the Parties to the Lease Contract to the Contrary.*

### A. *Priorities of the parties without an agreement.*

There is no dispute that the lease in these proceedings was junior to the Coast trust deed which was foreclosed. ■ The trust deed was recorded over two years before the execution of the lease; a lease executed after a trust deed is recorded is subordinate to the trust deed. (*Goldstein* v. *Ray* (1981) 118 Cal.App.3d 571, 575 [173 Cal.Rptr. 550].) ■ Also, there is no dispute that the general rule is that foreclosure of a senior encumbrance terminates subordinate liens, including leases. (*Hohn* v. *Riverside County Flood Control etc. Dist.* (1964) 228 Cal.App.2d 605, 613 [39 Cal.Rptr. 647].)

Without an agreement to alter the priorities, neither Coast nor the defendants would have had obligations under the lease after the foreclosure of the prior trust deed; the foreclosure would have terminated, "wiped out," the lease and all rights and obligations under it. The lender could consider the tenant as a trespasser, and the tenant would have no obligation to perform under the lease.

### B. *Effect of the agreement to rearrange priorities.*

■ Parties to real estate transactions can contractually agree to alter the priorities otherwise fixed by law so as to avoid the termination of rights under the general rule that foreclosure terminates the rights under a junior lease. (*Dover Mobile Estates* v. *Fiber Form Products, Inc.*, supra, 220 Cal.App.3d 1494, 1498; *Bank of America* v. *Hirsch Merc. Co.* (1944) 64 Cal.App.2d 175, 183 [148 P.2d 110].) We therefore analyze the contract to determine whether the parties to the lease did so in this case.

### 1. *Parties to Lease.*

The landlord was Equities I, with Barton signing as general partner. The tenant was Barton Development, with a vice-president signing for the corporation. Barton was the president of Barton Development and the developer

of Barton Plaza. Thus, in a sense, Barton was acting as both landlord and tenant. We are therefore dealing here with presumably knowledgeable parties who executed a lease containing provisions acceptable to them, not with contracting parties of unequal power or circumstances of adhesion.

### 2. SNDA Provisions.

The lease contains provisions for subordination, nondisturbance and attornment, sometimes known as SNDA. "Although it might seem a cobweb-filled corner of real estate law, the realm of subordination, non-disturbance and attornment has drawn the attention of mortgagees over the last few years as the level of foreclosures has increased." (Feinstein & Keyles, *Foreclosure: Subordination, Non-Disturbance and Attornment Agreements* (Aug. 1989) 3 Prob. & Prop. 38 (hereafter, *Foreclosure*).) "Although SNDAs are common to virtually every commercial real estate transaction, there has been very little analysis of the basic concepts of SNDAs, and surprisingly few cases have interpreted SNDAs or the rights and obligations of the parties to SNDAs." (Fisher & Goldman, *The Ritual Dance Between Lessee and Lender—Subordination, Nondisturbance, and Attornment* (Fall 1995) 30 Real Prop., Prob. and Trust J. 355, 357 (hereafter, *Ritual Dance*).)

Subordination is "[t]he act or process by which a person's rights or claims are ranked below those of others: *e.g.* a second mortgagee's rights are subordinate to those of the first mortgagee." (Black's Law Dict. (6th ed. 1990) p. 1426, col. 1.) A subordination agreement is "An agreement by which one holding an otherwise senior lien or other real estate interest consents to a reduction in priority vis-a-vis another person holding an interest in the same real estate. An agreement by which the subordinating party agrees that its interest in real property should have a lower priority than the interest to which it is being subordinated." (Black's Law Dict., *supra*, p. 1426, col. 2.)

Under a nondisturbance agreement, a "mortgagee covenants that, in the event of a foreclosure, the tenant will remain on the leased premises so long as the tenant continues to comply with the terms of the lease and the lease is not in default." (*Foreclosure, supra*, at p. 39.) "Nondisturbance is a modern concept. In fact, *Black's Law Dictionary* does not even define the term." (*Ritual Dance, supra*, at p. 360.) "Realistically, the concept of nondisturbance is frequently intended to refer not only to nondisturbance of the tenant's right of possession, but also to full recognition of all of the tenant's rights under its lease." (*Ritual Dance, supra*, at p. 361.)

"Attornment, in its present day form is very much a corollary agreement addressing foreclosure." (*Foreclosure, supra*, at p. 39.) Attornment is

". . . the act of a person who holds a leasehold interest in land, or estate for life or years, by which he agrees to become the tenant of a stranger who has acquired the fee in the land, or the remainder or reversion, or the right to rent or services by which the tenant holds. It is an act by which a tenant acknowledges his obligation to a new landlord." (Black's Law Dict., *supra*, p. 130, col. 1.) Under an attornment clause, a "tenant covenants with the mortgagee that, in the event of foreclosure, the lease will not be extinguished but will continue as a lease between the mortgagee (or any successor to it) and the tenant. The tenant, in other words, agrees to recognize that another party who would not otherwise have privity may enforce the lease agreement as though the third party were originally a beneficiary of the agreement." (*Foreclosure, supra,* at p. 39.)

It should be noted that SNDA provisions may alter the rights of the parties not only with respect to foreclosure actions, but also in connection with distribution of insurance proceeds, condemnation awards, and promises made outside the lease. (*Foreclosure, supra,* at p. 40.)

### 3. *The SNDA Clauses in the Present Lease.*

The subordination and nondisturbance clause in the lease has essentially three parts, the first two of which are linked to one another. Under paragraph 23, the landlord, first trust deed holder, or ground lessor could: (1) ask, in writing, that the tenant subordinate its interest and then (2) the tenant had the right to obtain from the requesting party an agreement that the lease remain in effect for the full term. This is the classic subordination and nondisturbance formula of SNDA clauses. The paragraph also provides that (3) the holder of a security interest could elect to have the lease prior to its security "regardless of the time of the granting or recording of that security interest." When the lease was executed, Coast was not a party to the lease, and the lease was subordinate to the trust deed held by Coast. Coast had the power to foreclose and eliminate the rights of the parties under the lease; nothing in the contract between the landlord and the tenant could change that without Coast's consent. Thus, the subordination clause of the lease was of no value to Coast since its senior position was already fixed by law.

Coast had no need to ask that the tenant subordinate since Coast's position was already fixed by law. The tenant's right to an agreement of nondisturbance did not exist without a subordination request. Thus, the nondisturbance clause of the lease was of no value to the tenant. Coast did not, prior to its foreclosure, elect to have the lease prior to its interest. The positions of the parties were, so far as the subordination and nondisturbance clause was concerned, fixed by law. The only potential effect of the clause was to allow the lender to elect that the lease become senior, and this did not happen.

The third of the SNDA provisions, an attornment clause, is also present in paragraph 23. The tenant agreed to recognize, or attorn to, a new landlord who could be the purchaser in a foreclosure sale or the transferee in a transfer in lieu of foreclosure. The successful bidder at a foreclosure sale or any transferee in a deed in lieu of foreclosure conceivably could be a new player on the scene. Thus, the tenant attorned either to the existing lender or potentially to a new party not previously involved in any way.

### 4. *Effect of the Attornment Clause.*

Under the attornment clause of the lease, Barton Development agreed with its original landlord that it would accept a substituted landlord under pre-scribed conditions, one of which occurred in the instant case. This is the expected result of the attornment clause in the lease.

However, defendants argue that the case of *Dover Mobile Estates* v. *Fiber Form Products, Inc., supra*, 220 Cal.App.3d 1494, supports their position that the lease was extinguished following the foreclosure. The lower court based its decision granting summary judgment upon that case.

In *Dover* the tenant entered into a lease which contained a subordination clause which provided that the lease was subordinate to any deeds of trust unless the trust deed holder elected to have the lease be superior. (This is commonly known as an automatic subordination. Since the instant case does not have this type of subordination agreement, the distinction between types of agreements is unimportant.) A second trust deed, recorded after the lease, was foreclosed upon. The purchaser at the sale sought to enforce the lease. The court held that the foreclosure terminated the lease, and the plaintiff could not enforce the terms of it. (*Dover Mobile Estates* v. *Fiber Form Products, Inc., supra*, 220 Cal.App.3d at p. 1501.)

*Dover* is distinguishable for the simple reason that the court in that case did not discuss whether the lease contained an attornment clause or what the effect of such a clause would be. Reliance on *Dover* is inappropriate because that case does not discuss or rule upon attornment clauses and the present case is determined by a decision upon the application of such a clause. ▪ It is fundamental that cases are not authority for propositions that are not considered therein. (*Roberts* v. *City of Palmdale* (1993) 5 Cal.4th 363, 372 [20 Cal.Rptr.2d 330, 853 P.2d 496].) The tenant's position was clearly subordinate, and the case properly held that the lease was extinguished. Here, in contrast, the attornment clause fixed the rights of the parties after the foreclosure. Defendants' position to the contrary requires a ruling that there is no meaning whatsoever to the language of the attornment

clause. This position violates the rule of contractual interpretation that requires meaning to be given to every part of a contract "if reasonably practicable." (Civ. Code, § 1641.)

### 5. The "Condition Precedent" to Attornment.

■ Defendants contend the language of the attornment clause created a condition precedent: that the party seeking to enforce the attornment clause has "acquire[d] and accept[ed] the property subject to the lease." Defendants contend that these words required Coast to give the notice called for under the subordination clause when the holder of the security interest elects to subordinate its interest to that of the tenant. We disagree.

The subordination clause (with concomitant nondisturbance clause) must be considered as separate from the attornment clause. Although those clauses could impact upon the same parties, their provisions potentially apply to different parties. A clause applicable to one set of parties does not logically provide a notice requirement for a condition precedent to another clause applying to different parties unless such a result is clearly indicated. There is no such clear indication of relationship between the clauses here.

The subordination clause establishes a right of the lender to subordinate its position to that of the tenant. Under certain circumstances, a lender may seek such a result. (See, e.g., West & Keyles, *Does the A in Your SNDA Work?* (Sept. 1993) 7 Prob. & Prop. 54, 55.) For instance, a subordination agreement may, as noted above, alter the priorities of the parties with respect to insurance proceeds or condemnation awards, among other things. However, the creation of an obligation for the tenant to attorn to a new landlord is quite different. The tenant presumably negotiated the lease with the landlord, and, for consideration, contracted to attorn to a new landlord under the described conditions. A landlord could want such a provision in the lease for a number of reasons, not the least of which is that the landlord could show the lease to others with whom it deals to demonstrate that its tenants are bound to new landlords. Such a provision could be a persuasive argument to a lender who was considering the financial condition of the landlord or the landlord's position vis-à-vis other parties involved with the real property. Thus, an attornment clause is not just gratuitously given in a vacuum, but has a meaning that can impact upon the rights and obligations of parties other than the immediate parties to the lease.

We conclude that interpretation of the plain language in the attornment clause does not support defendant's contention. The clause contains two parts (eliminating nonapplicable circumstances); (1) the tenant shall attorn to

the purchaser at a foreclosure sale (2) provided that the purchaser acquires and accepts the property subject to the lease. The second part, (2), contains two subparts; (2a) the purchaser "acquires" the premises and (2b) "accepts" the premises subject to the lease. The purchaser, Coast, acquired the property at the foreclosure sale. It could not know that it was going to acquire the property until the completion of the foreclosure. The purchaser, Coast, then was in a position to "accept" the premises subject to the lease or not.

Defendants argue that to determine what acceptance means in this context, we must look to the subordination clause, and that Coast "failed to elect to have the lease senior to the First Deed of Trust prior to the trustee's sale." Defendants then refer to "Coast's failure to exercise its option" as if the two things were the same. Defendants have their timing confused. As noted above, prior to the trustee's sale, Coast could not know whether it would be the successful bidder. It is illogical to expect Coast, as a prospective purchaser at the foreclosure sale, to exercise some option provided in a separate clause of the lease. It is common to have all three parts of SNDA clauses included in leases. If we were to support the rule proposed by defendant, all lenders similarly situated to Coast would have to "exercise their option" to subordinate their position to that of the tenant before they bid in at a foreclosure sale. There is neither logic nor fairness in such a rule, and we will not promulgate it here.

Further, we disagree with defendants' position that the "acquires and accepts" language necessitates any notice to the tenant prior to the foreclosure, let alone the alleged notice provided in the subordination clause. Rather, we interpret the "acquires and accepts" language as providing merely that the new landlord acknowledges and *agrees to be bound by* the existing lease—simply a reciprocal promise, akin to a nondisturbance clause—in exchange for the tenant's attornment. Under our interpretation of the language of this clause, the new landlord seeking to enforce the attornment clause acquires the duties and responsibilities of the prior landlord as well as the privilege of collecting rent under the lease.

The question therefore arises whether Coast "accepted" the property subject to the lease. According to the evidence in this case, Coast immediately, on the day of acquisition, gave notice to the tenant that it was the new owner and that thereafter all rent payments should be made payable to Coast. In two other instances, it acknowledged that it expected the tenant to abide by the lease. It thus accepted the premises subject to the lease. It is illogical to assume that it would make any pronouncement as to payment of rent or give notice of its acceptance of the lease before it acquired the property.

To phrase it another way, the tenant attorned to the new landlord, whoever that may be, when the tenant entered into the lease. The only condition

precedent to that attornment was that the new landlord had to acquire the premises and accept the premises subject to the lease. Coast did that here, and the condition precedent was satisfied. The preexisting obligation to attorn to the new landlord was implemented when Coast acknowledged that it was, indeed, the new landlord.

We conclude that Coast's foreclosure did not terminate the obligations of the tenant under the lease. The tenant had contracted to alter the priorities otherwise established by law. Defendants, in the clear language of the lease, had agreed to attorn to the purchaser at a foreclosure sale, and Coast was such a purchaser. The attornment clause obligated defendants to accept Coast, and hence its assignee, the plaintiff, as a new landlord. Further, Coast's actions, as found in the record before us, satisfied any requirements imposed upon it to accept the premises subject to the lease. As a matter of law, plaintiff is entitled to the status of a landlord, and defendants are obligated under the lease. Similarly, plaintiff is bound to perform the duties and responsibilities assigned to the landlord under the lease.

Thus, the trial court erred in granting summary judgment on the ground the lease had terminated.

### DISPOSITION

The judgment is reversed. The appellant shall recover costs on appeal.

McDaniel, J.,* concurred.

**HOLLENHORST, Acting P. J.**—I dissent.

I agree with the majority that (1) the nonjudicial foreclosure of a trust deed extinguishes a subordinate lease and (2) the lender did not exercise an option to obtain a subordination agreement that would change this result by making the lease senior to the deed of trust.

I disagree with the majority's conclusion that there was nevertheless a subordination agreement here because (1) the lease contained an attornment clause and (2) the lender requested payment of rent to it after the foreclosure.

I agree with the trial court that the lease, including the attornment clause, was extinguished by the foreclosure sale by operation of law, leaving the tenant on a month-to-month tenancy.

---

*Retired Associate Justice of the Court of Appeal, Fourth District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

1. *The General Rule Is That a Junior Lease Is Automatically Extinguished by a Nonjudicial Foreclosure.*

In my view, the trial court properly relied on *Dover Mobile Estates* v. *Fiber Form Products, Inc.* (1990) 220 Cal.App.3d 1494 [270 Cal.Rptr. 183]. That case succinctly states the applicable general principles: "Title conveyed by a trustee's deed relates back to the date when the deed of trust was executed. [Citation.] The trustee's deed therefore passes the title held by the trustor at the time of execution. [Citation.] Liens which attach after execution of the foreclosed trust deed are extinguished. The puchaser at the trustee sale therefore takes title free of those junior or subordinate liens. [Citations.] [¶] A lease is generally deemed to be subordinate to a deed of trust if the lease was created after the deed of trust was recorded. . . . [¶] A lease which is subordinate to the deed of trust is extinguished by the foreclosure sale. [Citations.] A foreclosure proceeding destroys a lease junior to the deed of trust, as well as the lessee's rights and obligations under the lease." (*Id.,* at p. 1498.)

The majority agrees with these general principles, stating that "there is no dispute that the general rule is that foreclosure of a senior encumbrance terminates subordinate liens, including leases." (Maj. opn., *ante,* at p. 1326.) I refer to this rule as the automatic termination rule.

2. *A Subordination Agreement Could Have Been Used to Prevent Automatic Termination of the Lease Upon Foreclosure.*

"The priority of interests in or liens on real property can be altered by a voluntary agreement between the parties. A person holding an existing interest in real property can agree, for a consideration, that his interest is to be junior in priority to an interest subsequently created and recorded. As a result of the agreement, the interest subsequently created obtains priority over the previously existing interest. Such an agreement is called a 'subordination agreement.'" (3 Miller & Starr, Cal. Real Estate (2d ed. 1989) Recording and Priorities, § 8:157, p. 617.)

The lease here contains a subordination and attornment provision. It contains four sentences. The first sentence of the subordination clause in this lease requires the tenant, upon request, to subordinate its rights to the lien of a first mortgage or first deed of trust. Since the lease was already junior to the lien of the first deed of trust, I agree with the majority that this sentence is not directly applicable to the current situation.

The second sentence is the nondisturbance clause. It provides a degree of protection to the tenant by assuring the tenant that, before it is required to

sign a subordination agreement, it can obtain assurances from its new landlord that, so long as it is not in default, the lease will remain in effect for the full term.

Again, *Dover* is instructive: it provides that ". . . the tenant under a subordinate lease can obtain some protection by requiring the landlord to obtain from its lender a non-disturbance agreement in favor of the tenant. Such an agreement provides that the lender with a superior lien will not, 'by foreclosure or otherwise, disturb the tenant's possession, as long as the tenant is not then in default under the lease.' [Citation.]" (*Dover Mobile Estates* v. *Fiber Form Products, Inc., supra*, 220 Cal.App.3d 1494, 1500.) As discussed below, the majority's interpretation of the lease has the effect of eliminating this protection from the lease.

The third sentence states: "The holder of any security interest may, upon written notice to Tenant, elect to have this Lease prior to its security interest regardless of the time of the granting or recording of that security interest." In other words, this sentence, read together with the second sentence, provides that the holder of the security interest has the option of avoiding the automatic termination rule by requiring the tenant to enter into a subordination agreement that will preserve the lease. If it does so, the tenant can require an agreement which includes the nondisturbance provisions stated in the second sentence.

If preservation of the lease was important to the lender, it *could* have defeated automatic termination of the lease upon foreclosure by electing to subordinate its security interest to the lease, and it *could* have forced the tenant to accept it as the new landlord.

I agree with the majority that there was no such election here. As the majority opinion states, "The only potential effect of the clause was to allow the lender to elect that the lease become senior, and this did not happen." (Maj. opn., *ante*, at p. 1328.)

Having so decided, the majority should have followed *Dover*. In that case, as in this, the lease provided that the holder of a security interest could elect to have the lease be prior to the security interest. (*Dover Mobile Estates* v. *Fiber Form Products, Inc., supra*, 220 Cal.App.3d 1494, 1496, fn. 1, 1499.) In that case, as in this, the option was never exercised. "Accordingly, it is clear that the lease is subordinate to the deed of trust and was therefore extinguished by the trustee's sale." (*Dover Mobile Estates, supra*, at p. 1499.)

Instead of so holding, the majority goes on to find that no subordination agreement was necessary because the attornment clause, plus certain unrecorded letters from the lender, constituted an agreement which avoids the automatic termination rule.

### 3. *The Attornment Clause.*

The fourth sentence is the attornment clause. It provides: "In the event of any foreclosure sale, transfer in lieu of foreclosure or termination of the lease in which Landlord is lessee, Tenant shall attorn to the purchaser, transferee or lessor as the case may be, and recognize that party as Landlord under this Lease, provided that party acquires and accepts the Premises subject to this Lease."

The majority opinion gives this sentence unwarranted weight by interpreting it to be part of an agreement to alter priorities without the use of a subordination agreement. Before examining the majority's strained construction, we need to briefly review the historic function of an attornment clause.

At common law, the feudal obligation between lord and tenant was a personal and reciprocal one. The consent of the lord was therefore required for a sale of the tenant's interest, and the consent of the tenant was required for an alienation of the reversion or remainder interest in property. Thus, the lord could not alienate his reversion or remainder interest without the consent of the tenant. The consent was called an attornment. (2 Blackstone's Commentaries 71-72; 49 Am.Jur.2d, Landlord and Tenant, § 1053, pp. 823-824.) The necessity for an attornment was abolished before the American Revolution by the Statute of Anne and, under the common law in effect at that time, the landowner could transfer the remainder or reversion without consent of the tenant. (51C C.J.S., Landlord & Tenant, § 22, p. 54.)

In California, the common law rule eliminating the requirement of attornment has been confirmed by statute. Civil Code section 1111 provides that "Grants of rents or of reversions or of remainders are good and effectual without attornments of the tenants; but no tenant who, before notice of the grant, shall have paid rent to the grantor, must suffer any damage thereby." (See also Civ. Code, §§ 1948 [attornment to stranger void], 821 [grantee has same rights as grantor against tenant]; Evid. Code, § 624 [tenant estopped to deny title of landlord].)

Currently, the term "attornment" refers to the obligation of the tenant to acknowledge his or her obligations to a new landlord, "most often, the agreement of a tenant to pay rent to a new landlord, especially a mortgagee who has foreclosed." (Black's Law Dict. (6th ed. 1990) p. 130, col. 1.) The inclusion of an attornment clause in the lease therefore requires the tenant to acknowledge continuation of the existing lease under a new landlord under its previously existing terms and conditions. (51C C.J.S., Landlord & Tenant, § 22, pp. 55-56.) "Attornment contemplates the act or agreement by a

tenant accepting one person in place of another as his landlord." (*Krasner* v. *Transcontinental Equities, Inc.* (1979) 170 A.D.2d 312 [420 N.Y.S.2d 872, 875]; see also *Ripple's of Clearview* v. *Le Havre Associates* (1981) 111 Misc.2d 263 [443 N.Y.S.2d 824, 826].)

It should be apparent from the foregoing that the inclusion of the attornment clause in this lease provided a firm foundation for the lender, as a third party beneficiary of the attornment clause, to require the tenant to enter into a subordination agreement which would make the lease prior to the lien of the deed of trust, thus avoiding the automatic termination rule. However, the attornment clause is not itself a substitute for a subordination agreement.

The attornment clause was subject to the condition that its requirements only became applicable if the purchaser "acquires and accepts the Premises subject to this lease." In my view, this condition refers to the preceding sentence, i.e., it applies to the holder of a security interest who elects to have the lease survive foreclosure. The majority disagrees. It argues that this clause does not refer back to the preceding sentence but rather is independent of the subordination clause. Read independently, the majority concludes that the condition was satisfied when the purchaser notified the lessee to pay rent to it.

As a result of this reading, the tenant is forced to continue its tenancy under the lease, without the protection afforded by the nondisturbance clause. The effect is that the tenant loses the protection afforded by the nondisturbance clause, and that clause is effectively read out of the lease. The majority's strained interpretation thus violates the basic rule of contract interpretation stated in Civil Code section 1641: "The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other."

4. *The Majority Opinion Finds a Subordination Agreement Where There Is None.*

The majority agrees that there must be an agreement to alter priorities in order for plaintiff to prevail. Although there was no subordination agreement in this case, the majority finds that "[t]he tenant had contracted to alter the priorities otherwise established by law." It thus finds an agreement to subordinate, and a concomitant avoidance of *Dover*'s automatic termination rule, in the lease and other documents. Specifically, the majority finds that the lease survives the foreclosure sale because (1) the tenant agreed to the attornment clause in the original lease with the former landlord and (2) the lender notified tenant to make rent payments to it after the foreclosure.

According to the majority, this alleged agreement had the effect of a formal subordination agreement.

I find this interpretation untenable for the following reasons.

First, the attornment clause is not a substitute for a subordination agreement. As discussed above, the attornment clause allowed the lender to require the tenant to enter into a subordination agreement which would make the deed of trust subordinate to the lease. The letters asking the tenant to pay rent to the lender after foreclosure, whether read with the attornment clause or independently, are not, in my view, a substitute for a subordination agreement.

Second, the majority's contrary interpretation has the effect of depriving the subordination clause of any meaning. As discussed above, the subordination clause does not itself effect subordination. It only gives the holder of the security interest the right to require a subordination agreement in return for a nondisturbance agreement. By holding that the attornment clause and notification letters are themselves an agreement to subordinate, the majority eliminates the lender's option under the subordination clause, eliminates the need for separate subordination agreements and eliminates the protection given by the nondisturbance clause. As discussed above, it is particularly unfortunate that the protection of the nondisturbance clause is effectively written out of the lease by the majority's interpretation.

The majority justifies the ignoring of the subordination clause by remarking that "the subordination clause of the lease was of no value to Coast since its senior position was already fixed by law." However, I think that the subordination clause of the lease was valuable to Coast because it was seeking to preserve the lease and enforce its terms. The third sentence of the subordination clause provided it with the means to do so. However, it did not invoke its rights under the clause, thus leading to the tenant's reliance on the automatic termination rule. In any event, such an interpretation is contrary to the rules of statutory interpretation. (Civ. Code, §§ 1638, 1639, 1641, 1643-1645.) "In the construction of . . . [an] instrument, the office of the judge is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted, or to omit what has been inserted; and where there are several provisions or particulars, such a construction is, if possible to be adopted as will give effect to all." (Code Civ. Proc., § 1858.)

Third, the majority's strained interpretation of the attornment clause, together with its reliance on letters that only demand payment of rent to the

new owner, is an interpretation which introduces uncertainty into the otherwise well-settled law which requires written subordination agreements to adjust priorities between lenders and tenants. Such an interpretation will lead to other litigants claiming that subordination occurred because of documents and correspondence other than formal subordination agreements. For example, a tenant who wishes to preserve its lease, which includes an attornment clause, will claim that a routine written notice, given after foreclosure, that rent should be paid to the new landlord acted as a subordination agreement, thus making the lease superior to the lien of the trust deed. In such a situation, the lender would not be able to evict the tenant, even if it did not wish to be bound by the terms of the lease, considered the lease terminated, and only intended the rent to be payable under a month-to-month tenancy.

The majority's interpretation also avoids the specificity required in certain subordination agreements. For example, a subordination agreement for loans under $25,000 must contain specific terms which expressly notify the parties that the statutory priorities are being modified. (Civ. Code, § 2953.3.)

Fourth, the majority's interpretation contradicts the purpose and function of recording subordination agreements. Because the automatic termination rule is a result of application of priorities under the recording laws, subordination agreements are generally recorded to give constructive notice that the usual priority rules have been modified by agreement. (Civ. Code, § 2934; *Protective Equity Trust #83, Ltd.* v. *Bybee* (1991) 2 Cal.App.4th 139 [2 Cal.Rptr.2d 864].)

For example, a prospective purchaser from Coast who examined title would find a senior deed of trust which had been foreclosed and a junior lease. Relying on the recording law, the prospective purchaser would conclude that the automatic termination rule applied. If the purchaser bought the property thinking that the lease was terminated, the lessee could nevertheless contend that the lease was still valid because of the attornment provision in its original lease and an unrecorded letter from Coast requesting payment of rent to Coast. Thus, the majority's interpretation would introduce uncertainty into a previously settled area of the law.

These actions by a tenant could burden the lender's property without its prior knowledge. For this reason, the automatic termination rule eliminates all encumbrances subsequent to the deed of trust. There is a sound policy basis for such a rule: "The policy underlying the [automatic termination] rule is to protect lending institutions from fraudulent amendments to leases which would encumber the value of their acquired property. If the rule were different, lending institutions would be discouraged from making loans since

they would have no assurances that the borrower and senior leaseholder would not drastically reduce the value of the lease, thereby reducing the value of the property . . . ." (*R-Ranch Markets #2, Inc.* v. *Old Stone Bank* (1993) 16 Cal.App.4th 1323, 1328 [21 Cal.Rptr.2d 21]; *Homestead Savings* v. *Darmiento* (1991) 230 Cal.App.3d 424, 437 [281 Cal.Rptr. 367].)

Fifth, the majority's opinion undercuts the automatic termination rule by allowing a lease provision and postforeclosure documents to circumvent the rule, even though the lease itself was previously terminated. Since the lease, including the attornment clause, was previously terminated, the lender never became a successor landlord under the lease and had no right to enforce the lease against the tenant.

Sixth, the majority opinion finds that *Dover* is distinguishable "for the simple reason that the court in that case did not discuss whether the lease contained an attornment clause or what the effect of such a clause would be." (Maj. opn., *ante*, at p. 1329.) I find this an insufficient basis for distinguishing *Dover*, since we do not know if the lease in that case contained an attornment clause or not. However, since it is common for attornment clauses to coexist with subordination and nondisturbance clauses (*Chumash Hill Properties, Inc.* v. *Peram* (1995) 39 Cal.App.4th 1226, 1230-1231, 1233 [46 Cal.Rptr.2d 366]), it is more likely that there was an attornment clause in the *Dover* lease, but the court did not discuss it because no one thought to give it the undue emphasis and strained construction given the attornment clause here. (*Dover Mobile Estates* v. *Fiber Form Products, Inc., supra,* 220 Cal.App.3d 1494, 1496, fn. 1, and 1499.) What is clear is that the subordination clause in *Dover* was, except for the nondisturbance clause, essentially identical to the subordination clause here.

Finally, I note that the majority does not follow its own rules. It states: "[W]e interpret the 'acquires and accepts' language [of the attornment clause] as providing merely that the new landlord acknowledges and agrees to be bound by the existing lease . . . ." (Maj. opn., *ante*, at p. 1331, italics omitted.) Thus, it finds a subordination agreement whenever the new landlord acknowledges the preexisting lease and agrees to be bound by it.

If this is the proper rule defendant should still prevail because the letters relied on by the majority do not contain any promise by the new landlord that it will be bound by the terms of any existing lease, nor do they evidence any intent that the lease become prior to the lien of the trust deed. The letters merely request that rental payments be made to the new property manager. Since Coast never agreed to be bound by the terms of the existing lease, the trial court's decision should nevertheless be affirmed, even applying the majority's rules.

## 5. *Conclusion.*

The majority distorts the meaning of the attornment clause of the lease to avoid the effect of the automatic termination rule. By construing the attornment clause and a letter directing rent to be paid to the new landlord as an unrecorded subordination agreement, the majority ignores the third sentence of the subordination clause. That sentence gives the lender the option to have the lease be prior to the security interest. The option was not exercised here.

The majority's interpretation of the attornment clause is an unreasonable interpretation that vitiates the subordination clause. It is particularly troubling that the majority deprives the tenant of the protection afforded by the nondisturbance clause.

The majority's interpretation thus undercuts the previously settled law of subordination. Under that law, it is clear that a junior lease is extinguished by a nonjudicial foreclosure unless it ceases to be a junior lease because its priority is changed by a subordination agreement. While the lender could have exercised its rights under the subordination clause to compel the tenant to enter into a subordination agreement, it did not do so.

I therefore agree with the trial court that *Dover* is factually indistinguishable and correctly determines the issue here by holding that "A lease which is subordinate to the deed of trust is extinguished by the foreclosure sale." (*Dover Mobile Estates* v. *Fiber Form Products, Inc., supra*, 220 Cal.App.3d 1494, 1498.)

I would affirm the judgment.

A petition for a rehearing was denied March 17, 1997, and respondents' petition for review by the Supreme Court was denied June 11, 1997. Kennard, J., was of the opinion that the petition should be granted.