[No. A094020. First Dist., Div. Three. June 20, 2002.]

C.H.E.G., Inc., Plaintiff and Respondent, v.
MILLENNIUM BANK, Defendant and Appellant.

**COUNSEL**

Jeffer, Mangels, Butler & Marmaro and David M. Wiseblood for Defendant and Appellant.

Law Offices Of Robert E. White, Robert E. White and Susan C. Rushakoff for Plaintiff and Respondent.

**OPINION**

**POLLAK, J.**—Defendant Millennium Bank, formerly known as First Indo-American Bank (the bank), appeals from the judgment entered in favor of plaintiff C.H.E.G., Inc., doing business as Wall Street Properties (CHEG), on its complaint for breach of contract. The bank had purchased a commercial building in a bankruptcy sale free and clear of all interests and eventually sold the building to the tenant who had been occupying it under a lease

with the bankrupt lessor, which lease contained a provision entitling CHEG to a commission upon sale to the tenant. The trial court found that the bank had assumed the unexpired lease and therefore was obligated to pay CHEG the commission. The bank contends that the bankruptcy court terminated CHEG's right to a commission when it ordered the property transferred free and clear of all interests in the property, and that the bank did not thereafter assume a contractual obligation to pay CHEG a commission. We agree and therefore reverse the judgment.

## FACTUAL AND PROCEDURAL HISTORY

CHEG is a general partner of Rivendell II Ltd., L.P. (Rivendell), a California limited partnership. Victor Catanzaro is the sole shareholder of CHEG and is the other general partner of Rivendell.

In 1990, the bank made a construction loan to Rivendell in the amount of $1,771,000. The loan was secured by a single deed of trust on three parcels of land in San Mateo on which Rivendell built an industrial park. The industrial park consisted of three separate buildings, referred to as buildings A, B, and C.

On March 31, 1992, Rivendell leased building A to International Marine Products, Inc. (IMP). CHEG represented IMP in its lease with Rivendell and was paid a commission by Rivendell upon execution of the lease. The lease between IMP and Rivendell provided for additional broker's fees to be paid to CHEG upon the occurrence of certain future events, including the sale of the building to IMP.

In 1993, the bank's loan to Rivendell matured and was not renewed or paid. The bank filed a notice of default to foreclose on the property. In response, Rivendell filed a voluntary petition for relief under chapter 11 of the United States Bankruptcy Code (11 U.S.C.). The bank ultimately purchased building A from Rivendell through an auction held in the bankruptcy court for $763,000 to be credited against the defaulted loan. The court ordered the sale free and clear of all liens, interests or encumbrances. As part of the sale of the building, Rivendell and the bank also entered into an "Agreement for Mutual Release of Claims." On October 28, 1994, Rivendell executed a deed transferring building A to the bank.

In December 1994, the bank sold building A to IMP. In February 1995, Mr. Catanzaro learned of the sale and sent a letter to the bank requesting payment of a commission on the sale. The bank rejected his claim. On December 28, 1998, CHEG filed the instant action against the bank to recover the commission.

The parties tried the case to the court based on a stipulated evidentiary record. Judgment was entered in favor of CHEG for $81,052.12 plus interest and attorney fees. The bank filed a timely notice of appeal.

## DISCUSSION

This case was tried on a stipulated evidentiary record that included stipulations of fact as well as excerpts from various deposition transcripts, transcripts of hearings before the bankruptcy court, correspondence, and other writings. The court found that the purchase of the building by the bank with the approval of the bankruptcy court did not operate to extinguish the lease and that the bank's conduct after the sale created an attornment whereby the bank became the landlord under the lease. Accordingly, the court concluded that pursuant to the terms of the lease, the bank owed CHEG a commission on the sale. The trial court also found that the release signed by Rivendell and the bank did not release any claims by CHEG against the bank. The bank contends that, contrary to the trial court's ruling, CHEG was not entitled to a commission because the bankruptcy order transferred building A to the bank free and clear of CHEG's interest in the property and the bank did not thereafter assume Rivendell's obligation to pay CHEG a broker's fee under the lease. Moreover, the bank argues that even assuming the broker's fee provision was enforceable, any claims by CHEG against the bank were expressly released in the bankruptcy proceedings and that CHEG's unreasonable delay in filing this lawsuit estops it from pursuing this claim.

To the extent that the court was required to make ultimate findings of fact based on inferences drawn from the evidentiary material, those findings will be binding on appeal if supported by substantial evidence. (*Aerospace Corp. v. State Bd. of Equalization* (1990) 218 Cal.App.3d 1300, 1312, fn. 6 [267 Cal.Rptr. 685].) To the extent, however, that the trial court was called upon to construe the language of the bankruptcy order, the lease or the Agreement for Mutual Release of Claims, without relying on parol evidence, the issue is one of law that the appellate court reviews de novo. (*Winet v. Price* (1992) 4 Cal.App.4th 1159, 1166 [6 Cal.Rptr.2d 554].)

*The Terms of the Lease*

The lease, originally entered into by Rivendell and IMP, was for a term of 10 years, expiring at the end of July 2002. The broker's fee provision contained therein provides in pertinent part: "(a) Upon execution of this Lease by both parties, Lessor shall pay to Wall Street Properties Licensed real estate broker(s) . . . per exhibit E for brokerage services rendered by

brokers in this transaction. [¶] (b) Lessor further agrees that if Lessee exercises any Option . . . which is granted to Lessee under this lease . . . Lessor shall pay said broker(s) a fee in accordance with the schedule of said broker(s) in effect at the time of execution of this Lease. [¶] (c) . . . Any transferee of Lessor's interests in this Lease, whether such transfer is by agreement or by operation of law, shall be deemed to have assumed Lessor's obligation under this paragraph 15. Said broker shall be a third party beneficiary of the provisions of this paragraph 15." Exhibit E to the lease provides in pertinent part: "Should the TENANT . . . purchase or enter into contract to purchase the leased property or any portion thereof during the term of the lease . . . then a sales commission shall be paid at such time as the purchase is consummated . . . ." The lease also contained an attornment clause which provides in part that "[l]essee agrees to execute any documents required to effectuate an attornment . . . . Lessee's failure to execute such documents within ten (10) days after written demand shall constitute a material default by Lessee hereunder . . . ."

### The Bankruptcy Court's Order Terminated CHEG's Rights Under the Lease

■ The bankruptcy court's order states that building A is "sold to [the bank] . . . free and clear of all liens, encumbrances and interests." The bank asserts that the lease was terminated when it purchased building A from Rivendell pursuant to this order. CHEG, however, asserts that the lease was not terminated because the order specifically lists seven liens that were terminated but does not list the lease, and that in any event, a lease is not an interest that can be terminated by a bankruptcy sale.

First, the omission of the lease from the liens enumerated in the order does not demonstrate that the order was not intended to terminate the lease. Paragraph 3 of the order states that "[b]uilding A . . . is hereby sold to [the bank] . . . free and clear of all liens, encumbrances and interests, except for real property taxes . . . ." It goes on to state that "[s]ave and except for the foregoing tax lien, . . . Building A is sold free and clear of the following liens to [the bank] . . . ." The order then lists seven liens. The order clearly differentiates between a lien and an interest or encumbrance and provides more specific treatment of the lienholders' interests. The court's more specific treatment of liens is consistent with United States Bankruptcy Court, Northern District of California, Local Rules, rule 6004-1. Rule 6004-1 requires that a motion to sell property free and clear of liens identify by name the lienholders whose rights are affected by the sale. The rule does not require the same when transferring property free of an interest other than a lien. Thus, the absence of the lease from the list of liens does not establish that the lease was not terminated by the sale.

More fundamentally, CHEG's right to earn a commission on the sale of building A, as set forth in the lease, is an interest that can be terminated by the bankruptcy court when approving sale of the property. Bankruptcy Code section 363(f) (11 U.S.C.) permits the court to authorize the sale of property free and clear of any entity's interest in the property if one of five conditions is satisfied.[1] (11 U.S.C. § 363(f).) The Bankruptcy Code does not contain a definition of "interest" for purposes of this statute. "Courts faced with the task of defining the scope of the term 'any interest' have been unable to provide a precise definition. [Citation.] Although some courts have narrowly interpreted that phrase to mean only in rem interests in property [citations], the trend seems to be towards a broader interpretation which includes other obligations that may flow from ownership of the property." (*Folger Adam Security, Inc. v. DeMatteis/MacGregor* (3d Cir. 2000) 209 F.3d 252, 258.) Uniformly, courts reaching this issue have determined that a lease is an interest under section 363. (See, e.g., *In re Taylor* (Bankr. D.S.C. 1996) 198 B.R. 142, 162 ["a leasehold interest is a type of 'interest' that fits within the plain text of the § 363(f)(4) statute"]; *In re Downtown Athletic Club of New York City, Inc.* (Bankr. S.D.N.Y., June 9, 2000, No. M-47) 2000 WL 744126.)

In some contexts, difficulties have arisen in reconciling section 363(f) of the Bankruptcy Code with section 365(h). Bankruptcy Code section 365(h) permits the bankruptcy trustee to reject an unexpired lease but sets forth specific rights of the tenant should the lease be rejected, including the right to retain possession at the agreed rent for the term of the lease.[2] "Section 365(h) appears to grant the tenant the right to retain the benefits of the lease,

---

[1]Bankruptcy Code section 363(f) (11 U.S.C.) reads in full: "The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if—[¶] (1) applicable nonbankruptcy law permits sale of such property free and clear of such interest; [¶] (2) such entity consents; [¶] (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property; [¶] (4) such interest is in bona fide dispute; or [¶] (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest."

[2]Bankruptcy Code section 365 (11 U.S.C.) reads in relevant part: "(a) Except as provided in sections 765 and 766 of this title and in subsections (b), (c), and (d) of this section, the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor. [¶] . . . [¶] (h)(1)(A) If the trustee rejects an unexpired lease of real property under which the debtor is the lessor and—[¶] (i) if the rejection by the trustee amounts to such a breach as would entitle the lessee to treat such lease as terminated by virtue of its terms, applicable nonbankruptcy law, or any agreement made by the lessee, then the lessee under such lease may treat such lease as terminated by the rejection; or [¶] (ii) if the term of such lease has commenced, the lessee may retain its rights under such lease (including rights such as those relating to the amount and timing of payment of rent and other amounts payable by the lessee and any right of use, possession, quiet enjoyment, subletting, assignment, or hypothecation) that are in or appurtenant to the real property for the balance of the

while Section 363(f) appears to allow the trustee to divest the tenant of its leasehold." (*Precision Industries, Inc. v. Qualitech Steel SBQ, LLC* (Bankr. S.D.Ind., Aug. 24, 2001, No. IP00-0247-C-H/G) 2001 WL 699881, *11; *In re Churchill Properties III, Partnership* (Bankr. N.D.Ill. 1996) 197 B.R. 283, 286.) While there is some disagreement among federal courts as to how these provisions should be reconciled when dealing with the tenant's right to continued possession (compare *Precision Industries, Inc. v. Qualitech Steel SBQ, LLC, supra*, at *13-*14, with *In re Downtown Athletic Club of New York City, Inc., supra,* 2000 WL 744126, at *4), there is no question but that section 365(h) does not prevent the bankruptcy court from selling property free and clear of interests that extend beyond peaceful enjoyment of the property. "Section 365(h) indeed appears to draw a distinction between rejection of leases, ostensibly as contracts, and termination of leases, ostensibly as non-freehold possessory estates." (*Ultimate Sportsbar, Inc. v. United States* (Fed.Cl. 2001) 48 Fed.Cl. 540.) In *In re Bedford Square Associates, L.P.* (Bankr. E.D. Pa. 2000) 247 B.R. 140, the court recognized that not all of a tenant's rights under a lease are of equal importance and reconciled section 363 and section 365 by weighing the interests of the debtor/lessor in maximizing its use of its property against the interests of a tenant in enforcing lease provisions designed to protect its interests. ■ Congress's intent in enacting section 365 "was to afford the debtor the benefit of rejecting an undesirable lease while at the same time protecting the property rights of the lessee. [Citations.] Thus, 'rejection of the lease results merely in the cancellation of covenants requiring performance in the future (e.g. the providing of utilities, repair and maintenance, janitorial services, etc., which [landlord] maintains are burdensome) by the debtor; rejection does not terminate the lease completely so as to divest the lessee of his estate in the property.'" (*In re LHD Realty Corp.* (Bankr. S.D.Ind. 1982) 20 B.R. 717, 719.)[3]

■ Here, CHEG's interest under the lease is an "obligation[] that [is] connected to, or arise[s] from, the property being sold" and is susceptible to

term of such lease and for any renewal or extension of such rights to the extent that such rights are enforceable under applicable nonbankruptcy law."

[3]Recently, some courts have recognized a diminished effect of a trustee's rejection of an unexpired lease. (See *Vallely Investments v. BancAmerica Commercial Corp.* (2001) 88 Cal.App.4th 816 [106 Cal.Rptr.2d 689]; *In re Bergt* (Bankr. D. Alaska 1999) 241 B.R 17.) Under the emerging rule, " 'the effect of rejection of an executory contract or unexpired lease is limited to a breach or abandonment by the debtor or trustee rather than a complete termination of the lease.' " (*Vallely Investments v. BancAmerica Commercial Corp, supra,* at p. 829.) "The effect of the trustee's rejection is to relegate the damages from such breach to the status of an *unsecured claim.* A rejection is merely the trustee's election by an affirmative motion or by the passage of time in some cases (a 'deemed' rejection) that the estate not assume the obligation of the debtor as an *administrative expense.*" (*In re Bergt, supra,* at p. 25, fns. omitted.) Presumably then, under this emerging rule, CHEG's interest under the lease was not terminated by the sale, but remained an unsecured claim against Rivendell.

being reduced to a money judgment. "[A]ny interest in property that can be reduced to a money satisfaction" falls within the fifth condition of Bankruptcy Code section 363(f) (11 U.S.C.) and can be extinguished under its authority. (*Folger Adam Security, Inc. v. DeMatteis/MacGregor, supra,* 209 F.3d at p. 259.) The interest at stake—CHEG's right to a commission—provides no benefit to the tenant, and is not a right that is "in or appurtenant to the real property," so that it is not an interest protected by section 365(h). Accordingly, CHEG's right to a commission under the terms of the lease was extinguished by the sale of the property free and clear of all interests pursuant to the bankruptcy court order.

*The Bank Did Not Thereafter Assume Rivendell's Obligations Under the Lease to Pay CHEG a Commission on the Subsequent Sale of Building A to IMP*

As an alternative basis for holding the bank liable to pay CHEG its commission, the trial court concluded, "Independently, the bank's conduct after the sale, in accepting rent called for in the lease, using CHEG, Inc. as manager of the property and in enforcing various terms of the lease created an attornment, whereby the bank became the landlord under the lease with IMP, Inc. as tenant." However, while the bank's conduct after purchasing the building indicates an intent to assume some of the terms of the lease with respect to IMP, there is no evidence that the bank intended to assume the broker's fee obligation to CHEG. Continuing to use CHEG's management services for two months after purchasing the property may have evidenced the intent to pay CHEG for those ongoing services, but it did not evidence an intent to pay CHEG a commission on the sale of the building to IMP, which required no further involvement on the part of CHEG. CHEG does not suggest that after the purchase of the building to Rivendell, the bank made an explicit promise to pay the commission or acted in a manner that specifically indicated an intent to assume this particular obligation. Rather, CHEG treats the lease as an indivisible contract that can either be accepted or rejected as a whole, and it fails to distinguish its interests from those of IMP.

For the reasons discussed above, this approach is contrary to the law. Treating CHEG's interests under the lease as inseparable from IMP's interests is not consistent with the protections afforded IMP under the Bankruptcy Code. IMP's interests as the tenant are afforded considerably more protection in the bankruptcy proceedings than CHEG's third party interests. Although Bankruptcy Code section 365(h) protects the tenant's right to occupancy, section 363(f) permits the termination of the broker's right to a commission upon sale of the property.

CHEG cannot rely on the principle of attornment to revive this provision in the lease after the sale.[4] ■ "[A]ttornment is the act of a tenant by which he agrees to become the tenant of the property's new owner." (*Principal Mutual Life Ins. Co. v. Vars, Pave, McCord & Freedman* (1998) 65 Cal.App.4th 1469, 1484 [77 Cal.Rptr.2d 479].) An attornment clause normally is conditioned upon the successor landlord's acceptance of the property subject to the lease. (*Miscione v. Barton Development Co.* (1997) 52 Cal.App.4th 1320, 1330-1331 [61 Cal.Rptr.2d 280].)

The effect and operation of an attornment clause is dependent entirely on its language. (*Principal Mutual Life Ins. Co. v. Vars, Pave, McCord & Freedman, supra,* 65 Cal.App.4th at p. 1485.) For example, where the clause indicates that "the tenant agreed to attorn to the new owner and recognize that party 'under this Lease' so long as the new owner acquired and accepted the property 'subject to this Lease,'" the bargain struck between landlord and tenant contemplates the continued existence of their lease even after foreclosure. (*Ibid.*) However, there is no intent that the current lease survive where the tenant agrees "upon request, [to] 'enter into a *new lease*, containing all of the terms and provisions of this Lease . . . or at the election of such successor in interest, this Lease shall automatically become a *new lease* . . . upon all of the terms and conditions hereof . . . .'" (*Ibid.*) In such a case, the clause allows the succeeding lessor to either evict a tenant or hold the tenant to the lease, as the market dictates. (West & Keyles, *Does the A in Your SNDA Work?* (Oct. 1993) 7 Prob. & Prop. 54.)

■ Here, the attornment clause states that tenant agrees to execute any documents required to effectuate an attornment within 10 days of receipt of a written demand. By this language, IMP agreed to enter into a new lease with the bank with the precondition that the bank submit a written demand to IMP. The bank was a third party beneficiary of this agreement and thus entitled to enforce IMP's commitment to attorn. (*Principal Mutual Life Ins. Co. v. Vars, Pave, McCord & Freedman, supra,* 65 Cal.App.4th at pp. 1485-1488.) There is no evidence in the record that the bank made the necessary demand or that new lease documents were executed. Absent a valid attornment, the bank's acceptance of rent from IMP would create only a month-to-month tenancy. (5 Miller & Starr, Cal. Real Estate (3d ed. 2000) § 11:95, p. 242.)

Assuming that there was an implicit agreement between IMP and the bank to continue operating under the terms of the lease, the result would be no

---

[4]CHEG concedes that while the issue was addressed below under the principle of attornment, the legal concept is normally restricted to situations arising after foreclosure on the property. CHEG argues that the bankruptcy proceedings in this case are analogous to a foreclosure and thus that the principle of attornment is applicable. We see no reason in principle why the concept of attornment is not equally applicable in the present situation.

different. In that event, the implication would be that the bank agreed to assume the responsibilities of the prior landlord owed to IMP under the original lease, but this would not include duties owed to third parties. The successor landlord's implied commitment is to ensure that the tenant, who is held to its continuing obligations under the lease, receives the full consideration for which it bargained. To accomplish this objective, it is not necessary for the new landlord to agree to assume obligations to any other party. Thus, while the concept of attornment may bear on the rights and obligations of the bank and IMP after the bank's purchase of the building, an attornment would not bind a succeeding landlord to Rivendell's promise to pay CHEG a commission for services that had been fully performed before the bank acquired its interest in the property.

Accordingly, while the bank may have assumed certain obligations under the lease with regard to IMP, as it was bound to do under Bankruptcy Code section 365 (11 U.S.C.), it was not bound by Rivendell's promise to pay a broker's fee to CHEG. Because there was no contractual obligation that required the bank to pay CHEG a commission on the sale of building A to IMP, we reverse on that basis. It is therefore unnecessary to determine whether any of the bank's remaining arguments have merit.

### DISPOSITION

The judgment is reversed and remanded to the trial court with instructions to enter judgment in favor of the bank. The bank shall recover its costs on appeal.

McGuiness, P. J., and Parrilli, J., concurred.

A petition for a rehearing was denied July 16, 2002, and respondent's petition for review by the Supreme Court was denied October 16, 2002.